32 F.3d 1504
 UNITED STATES of America, Plaintiff-Appellee,
v.
Eugene Milton CLEMONS, II, a/k/a "Gene", a/k/a "Dean",
Dedrick Germond Smith, a/k/a Derrick, Defendants-Appellants.
 No. 93-6328.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 22, 1994.
 
 Tommy Nail, Jo Alison Taylor, co-counsel, Birmingham, AL, for Eugene Milton Clemons.
 J. Louis Wilkinson, Birmingham, AL, for Dedrick Germond Smith.
 Jack W. Selden, U.S. Atty., Robert J. McLean, John E. Ott, Bill Barnett, Asst. U.S. Atty., Birmingham, AL, for appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before TJOFLAT, Chief Judge, KRAVITCH, Circuit Judge, and CLARK, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 Eugene Clemons and Dedrick Smith were convicted of murdering a federal agent engaged in the performance of his official duties in violation of 18 U.S.C. Secs. 1111 and 1114. In addition, Clemons was convicted of using and carrying a firearm in the commission of a crime of violence, in violation of 18 U.S.C. Sec. 924(c). We affirm both convictions. The primary issue presented involves defining "official duties" under Section 1114.
 
 I.
 
 2
 George Douglas Althouse was a Special Agent of the U.S. Drug Enforcement Administration (DEA) assigned to the Birmingham, Alabama office. As part of his duties, Althouse worked on an investigation with Sergeant Mark Hobbs of the Hoover, Alabama Police Department. Hobbs and Althouse planned to meet on the evening of Thursday, May 28, 1992 between 10:00 and 11:00 p.m. to discuss search warrants to be executed the following day. Jefferson County Sheriff's Deputy Naylor Braswell, Althouse's housemate, agreed to accompany Althouse to the meeting with Hobbs. Braswell and Althouse left for the meeting shortly before 10:00 p.m. in Braswell's undercover automobile, a black Model Z-28 Camaro. En route, they stopped at a Chevron service station. Braswell went into the station to obtain the telephone number for a pizza delivery source. Althouse remained in the car. During the brief interval, Althouse appears to have made a phone call to his girlfriend from the car's cellular phone. While inside the service station, Braswell suddenly observed an individual sitting in the driver's seat of the Camaro and pointing a gun to Althouse's head. Moments later Braswell heard several shots and saw Althouse exit the car. Althouse fired his weapon at the Camaro as it sped away. Althouse died shortly thereafter from gunshot wounds.
 
 
 3
 Testimony offered at trial revealed that prior to the murder Dedrick Smith had told several individuals, including Clemons, that he needed an engine for his Z-28 Camaro. On the evening of the murder, Smith, Clemons and a third individual, Kenny Reed, drove to a shopping center looking for a suitable car for Smith. Failing to find such a vehicle, they proceeded onto the highway. When Clemons spotted a Z-28 Camaro in a Chevron service station, they stopped and Clemons, carrying a gun, exited the car. Smith and Reed were driving to a nearby parking lot to wait for Clemons when they heard several gunshots and observed Clemons, driving the Camaro, pull out of the Chevron station at high speed. Clemons drove to the house of a friend, Herman Shannon. After examining the contents of the car, Clemons and Shannon concluded that it was likely a police vehicle. Both Clemons and Smith subsequently left town. Clemons was arrested in Cleveland, Ohio on June 6. Smith was arrested in Birmingham several days later. Both were convicted by a jury of murdering Agent Althouse.
 
 
 4
 Clemons raises three substantive claims on appeal: (1) that the evidence was insufficient to show that the victim was a federal agent engaged in the performance of his official duties at the time of the murder; (2) that the court abused its discretion in admitting into evidence prior-similar-acts testimony; and (3) that the court abused its discretion in admitting into evidence a waiver and confession executed by Clemons in connection with a juvenile adjudication.[1]
 
 
 5
 Smith contends that the court erred in allowing the government to impeach Clemons by using Clemons's unredacted confession implicating Smith and in permitting him to be cross-examined by Clemons regarding irrelevant and prejudicial matters.
 
 II.
 
 6
 According to Clemons, the evidence presented at trial was insufficient to prove that Althouse was an agent engaged in the performance of his official duties within the meaning of 18 U.S.C. Sec. 1114. Because the question raised speaks to the court's jurisdiction in this matter, our review is plenary.
 
 
 7
 18 U.S.C. Sec. 1114 provides, in pertinent part:
 
 
 8
 Whoever kills or attempts to kill any ... officer or employee of the Secret Service or of the Drug Enforcement Administration ... engaged in or on account of the performance of his official duties ... shall be punished as provided under sections 1111 and 1112 of this title, except that any such person who is found guilty of attempted murder shall be imprisoned for not more than twenty years.
 
 
 9
 There is no bright-line test to define "performance of official duties" under the statute. While time and place may be of decisive importance in many cases, in others the mission may be of critical importance. United States v. Hoffer, 869 F.2d 123, 125 (2d Cir.1989), citing United States v. Boone, 738 F.2d 763, 765 (6th Cir.), cert. denied, 469 U.S. 1042, 105 S.Ct. 528, 83 L.Ed.2d 416 (1984). In essence, whether a federal officer is engaged in the performance of his or her official duties turns on whether the federal officer is acting within the scope of what he or she is employed to do, or is engaging in a purely personal frolic. United States v. Streich, 759 F.2d 579 (7th Cir.1985), citing United States v. Heliczer, 373 F.2d 241 (2d Cir.), cert. denied, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967).
 
 
 10
 Courts of Appeals have concluded that a federal agent is acting within the scope of his or her official duties in a variety of circumstances. In United States v. Stephenson, 708 F.2d 580 (11th Cir.1983), for instance, an FBI agent was assaulted and robbed of her purse as she walked from her car toward the FBI Building. Her purse contained her service revolver, an FBI badge and identification. Reasoning that the agent was "on her way to report for work at the FBI office," and that, in struggling with her assailant, "she was properly attempting to prevent theft of federal property," id. at 581, we concluded that the evidence was sufficient for a trier of fact to find that the agent was engaged in the performance of her official duties. Similarly, in United States v. Hoffer, 869 F.2d 123 (2d Cir.1989), a DEA agent had completed her assigned surveillance but remained "on call" when she was assaulted near her car. The court pointed to the fact that the agent was returning from her assignment; that she was in a government-owned vehicle which she was duty-bound to protect; and that she was "on call" for further assignment in support of its determination that the agent was discharging her official mission at the time of the assault. See id. at 126. See also, United States v. Streich, 759 F.2d 579 (7th Cir.1985) (where IRS agents were in course of repossessing appellant's vehicle when assaulted, agents held to be in course of official duties); United States v. Boone, 738 F.2d 763 (6th Cir.1984) (federal judge assaulted while walking to the federal courthouse on a Sunday evening in order to conduct legal research was engaged in her official duties); United States v. Lopez, 710 F.2d 1071 (5th Cir.1983) (federal agent assaulted while detaining a state-charged suspect held to be performing official duties); United States v. Reid, 517 F.2d 953 (2d Cir.1975) (where DEA agent was obligated to take action to prevent a violation of state law even when off-duty, agent shot while attempting to stop a robbery was engaged in his official duties).
 
 
 11
 Bearing in mind the fact-specific nature of our inquiry, we conclude that a jury could have determined beyond a reasonable doubt that agent Althouse was engaged in the performance of his official duties at the time of his murder. As stated earlier, our case law dictates that a federal officer on his or her way to work is engaged in the performance of official duties. See United States v. Stephenson, supra. Contrary to Clemons's suggestion, we decline to conclude as a matter of law that such an officer is no longer acting within the ambit of federal employment if he or she, before arriving either at the office or at a work-related meeting at another location, stops momentarily to make a telephone call. Surely this manner of detour does not constitute a "frolic" as envisioned by the court in its articulation of the scope of federal duties. See, United States v. Streich, supra. Althouse was on his way to a meeting concerning an investigation being conducted jointly by the DEA and the local police department. Sergeant Hobbs, the Hoover police detective whom Althouse planned to meet that evening, testified that on the occasions he and Althouse worked together their schedule was often erratic, leading them at times to work late at night. As such, it is not unreasonable to infer that they might have, on occasion, arranged during working hours for some form of food. In this instance, they intended to meet at approximately 10:30 p.m. to discuss obtaining search warrants the next day. Althouse merely stopped briefly to order dinner while en route to the meeting involving his duties as a DEA agent. Accordingly, we conclude that the evidence in this case was sufficient for a jury reasonably to have found that Althouse's conduct fell within the range of his prescribed, official duties.
 
 III.
 
 12
 Clemons next contends that the court improperly admitted evidence of prior uncharged misconduct. This court reviews the decision to admit extrinsic act evidence under Fed.R.Evid. 404(b) for clear abuse of discretion. United States v. Erin, 778 F.2d 722, 731 (11th Cir.1985). In evaluating the admissibility of Rule 404(b) evidence, we must determine whether (1) the evidence is relevant to an issue other than defendant's character; (2) there is sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the extrinsic act; and (3) the evidence possesses probative value outweighing any prejudicial effect. See United States v. Miller, 959 F.2d 1535, 1538 (11th Cir.1992) (en banc). When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused. Id. at 1539 (quoting United States v. Beechum, 582 F.2d 898, 912 n. 15 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)). See also United States v. Cardenas, 895 F.2d 1338, 1343 (11th Cir.1990) ("A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind.").
 
 
 13
 At trial, Clemons claimed that he had accompanied his aunt to commencement exercises at his former high school on the evening of Althouse's murder. Seeking to rebut Clemons's defense, the government introduced evidence of three similar carjackings committed by Clemons during the three-week period immediately preceding the carjacking in the instant case. Clemons does not dispute that the evidence was sufficient for the jury to conclude that he had committed the earlier carjackings, but argues that this evidence was advanced merely to impugn his character. In support of this proposition, Clemons suggests that carjackings at gunpoint are now fairly commonplace, and that the method by which these extrinsic offenses were committed was neither sufficiently peculiar nor idiosyncratic to constitute a "signature" crime; as a result, Clemons submits, the prior acts evidence in this case could not properly be used to demonstrate the identity of a singular assailant. We disagree.
 
 
 14
 There is little doubt that the identity of the individual who took Agent Althouse's life while hijacking his car was at issue in this trial. In presenting an alibi defense, Clemons effectively made identity a pivotal consideration for the jury to resolve. Accordingly, the jury was instructed to consider the extrinsic acts evidence for this sole purpose. Prior to the introduction of this evidence during the trial, the court stated:
 
 
 15
 Ladies and gentleman, you are about to hear evidence that at some other times than the time and the occasion charged in the indictment, that the defendant Clemons is claimed to have committed acts similar to the acts which are charged here. Such evidence is admitted only on the question regarding the identity of the person who committed the acts which are charged in this indictment. That is, that the defendant Clemons was the person who committed the acts that are charged in this indictment.[2]
 
 
 16
 The court again emphasized the limited purpose for which this evidence could be considered in its final charge to the jury. Significantly, the court specifically found that the prior uncharged acts allegedly committed by Clemons were sufficiently similar to the instant offense to warrant admitting the extrinsic evidence as demonstrative of a "signature" criminal act. In reaching this conclusion, the court informed the parties outside the presence of the jury:
 
 
 17
 The fact that an individual is driven to a location or driven around until a suitable vehicle is found, is dropped off, uses a firearm to rob the owner or the possessor of the automobile, the automobile is taken at gunpoint, the fact that the automobiles are of a similar type--those being small, high performance sports cars--the fact that they are returned or taken to Mr. Shannon's or somewhere near Mr. Shannon's and they are disposed of and then repaired, so that they can be disposed of and then are disposed of, those similar characteristics seem to me makes the evidence probative. Those incidents are relevant to the issue of identifying this particular individual as the person who perpetrated all of them by showing a pattern or a practice--a signature, if you will.[3]
 
 
 18
 We conclude that the district court did not abuse its discretion in determining that the prior uncharged conduct was sufficiently similar in nature and style to the charged offense to warrant admitting testimony pertaining to these extrinsic offenses. In United States v. Miller, supra, the court compared the drug transaction with which the defendant was charged with a transaction that took place several months later. Noting that each transaction was arranged by a beeper call; that in each case the supplier arrived within several minutes at the same location; and that both involved a supplier named "Louis," the court resolved that the similarity between the two offenses was such that the offenses were marked as "the handiwork of the accused." Id. at 1539. The evidence presented in the instant action gives rise to the same conclusion as that reached by this court in United States v. Miller. Here, the record demonstrates that in each of the prior, uncharged offenses--as in the instant offense--Clemons cruised shopping centers accompanied by one or two companions looking for high-performance sports cars to steal. In each case, a gun was used to wrest the car from its occupant, and in each case the stolen vehicle was deposited in the same neighborhood. The manner and method of carjacking employed by Clemons in each incident manifested a distinctive modus operandi. The only feature of Clemons's last carjacking offense distinguishing it from the previous acts was that it resulted in a murder. We therefore hold that the evidence was sufficient to permit the admission of extrinsic evidence on the question of identity.
 
 
 19
 In addition, Clemons argues that the district court abused its discretion in admitting evidence of a confession and waiver of rights executed by Clemons in connection with a prior state youthful offender adjudication. As a general proposition, evidence of juvenile adjudications is not admissible to impeach the credibility of a witness unless the witness is someone other than the accused and the conviction would be otherwise admissible to attack the credibility of an adult. Fed.R.Evid. 609(d). Here, however, we need not scrutinize further whether the testimony offered with respect to Clemons's earlier confession violated Rule 609(d), as the rule is not implicated in this instance. In his testimony on cross-examination, Clemons squarely denied having ever participated in a carjacking. The government sought to introduce a statement signed by Clemons in which he confessed to having committed such an offense.[4] The confession alone--not the fact of his youthful offender status or of any juvenile conviction arising from the confession--was introduced as a prior inconsistent statement. Fed.R.Evid. 613(b). No abuse of discretion occurred in the admission of this evidence.
 
 IV.
 
 20
 Smith challenges two evidentiary rulings. A redacted version of a statement made by Clemons to the police was introduced in the government's case-in-chief. During the government's cross-examination of Clemons, however, the government sought to introduce unredacted portions of the same statement, some of which contained testimony potentially prejudicial to Smith. In overruling Smith's objection to the admission of the unredacted statement, the court instructed the jury:
 
 
 21
 You should consider such evidence with caution and great care. It is for you to decide whether the defendant made the statement and if so, how much weight to give to it. In making these decisions you should consider all of the evidence about the statement, including the circumstances under which the defendant may have made it. And, of course, any such statement should not be considered in any way whatever as evidence with respect to any other defendant on trial.[5]
 
 
 22
 Smith suggests that the admission of the statement, presented solely to disadvantage him, constituted a Bruton violation and thus was an abuse of the trial court's discretion.
 
 
 23
 In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when a non-testifying codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant. See id. at 135-37, 88 S.Ct. at 1628. The concern enunciated by the Court in Bruton--that is, that the jury will look to "powerfully incriminating" extrajudicial statements by a codefendant in determining a defendant's guilt--is at issue only when the codefendant is unavailable for cross-examination. Id. at 132-34, 88 S.Ct. at 1626. See also, Cruz v. New York, 481 U.S. 186, 189-90, 107 S.Ct. 1714, 1717, 95 L.Ed.2d 162 (1987) ("Where two or more defendants are tried jointly ... the pretrial confession of one of them that implicates the others is not admissible against the others unless the confessing defendant waives his Fifth Amendment rights so as to permit cross-examination.")
 
 
 24
 Here, Clemons waived his Fifth Amendment right and took the stand. Clemons testified that he was not present at the scene of the carjacking-murder. His earlier confession to the police regarding the events that occurred that same evening was introduced by the government to impeach his testimony. Not only was Clemons available for cross-examination by his codefendant, but Smith in fact availed himself of this opportunity. Although Smith chose not to cross-examine Clemons concerning those specific statements brought forth in the unredacted confession, his right of confrontation was not violated. No Bruton violation occurred, and the admission of the unredacted statement was not an abuse of discretion.
 
 
 25
 Smith also argues that the court erred in allowing Clemons to cross-examine him concerning prior conduct involving drug use, ownership of a pistol and assault of a police officer. Although the court expressly prohibited the government from inquiring into Smith's prior conduct, each defendant was given wide latitude in cross-examining his codefendant. Smith testified on cross-examination by both the government and by Clemons that he had not witnessed people selling crack cocaine at Herman Shannon's house during the time he lived there, and that he had moved out of the house in the second week of January 1992. Clemons sought to impeach Smith's credibility by asking him whether he personally had ever used or sold crack cocaine; by inquiring into Smith's ownership of a pistol that he continued to keep at Shannon's house long after he claims to have moved out; and by inquiring into the facts surrounding Smith's arrest for assault of a police officer at Shannon's house subsequent to the date on which Smith moved out.[6]
 
 
 26
 Fed.R.Evid. 608(b) provides that specific instances of conduct, if probative of truthfulness or untruthfulness, may be inquired into on cross-examination of a witness. The court is given broad discretion in assessing the propriety of this mode of inquiry. See United States v. Dorn, 925 F.2d 1331, 1335 (11th Cir.1991). In this instance, questions pertaining to Smith's knowledge of possible drug transactions taking place at Shannon's house were raised for the first time on cross-examination. The relevance of this line of questioning was never demonstrated, and cannot be gleaned by this court. The government suggests that Clemons's inquiry was probative of Smith's credibility as "a witness who had been implicated by other witnesses who were at Shannon's house at the time of Agent Althouse's murder." We do not agree that the question whether Smith ever used or sold drugs was probative of his credibility as a witness. This circuit has long adhered to the proposition that a witness's use of drugs may not be used to attack his general credibility, but only his ability to perceive the underlying events and to testify lucidly at trial. United States v. Sellers, 906 F.2d 597 (11th Cir.1990). Neither Clemons nor the government contended at trial that Smith was unable to comprehend the events that transpired on the evening of Agent Althouse's murder due to the influence of crack-cocaine, nor did either party attempt to show that Smith was using drugs during the trial. The question of Smith's possible drug use was neither probative of his truthfulness or his capacity to testify nor relevant to discovering the facts of this case.
 
 
 27
 Moreover, in pursuing this line of inquiry, Clemons sought to impeach statements never expressed by Smith in direct testimony. As a general evidentiary rule, a defendant may only be impeached on cross-examination when the statement being impeached was reasonably suggested by the defendant's direct testimony. See United States v. Hernandez, 646 F.2d 970, 979 (5th Cir.1981) ("The prosecutor's range of inquiry is not unlimited. The government's questions must be 'reasonably related' to the subjects covered by direct testimony."). See also United States v. Havens, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); Pace v. Evans, 709 F.2d 1428 (11th Cir.1983). Smith never denied having used or sold drugs of any sort on direct examination; raising the issue on cross-examination under the rubric of impeachment of a prior inconsistent statement was thus improper. We therefore conclude that the question regarding Smith's previous use or sale of crack-cocaine was inadmissible.
 
 
 28
 Even where an abuse of discretion is shown, however, nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected. United States v. Sellers, 906 F.2d at 601. Here, Smith denied having used or sold crack-cocaine, and the matter was not only dropped entirely by Clemons's counsel, but was never raised again by any party for the remainder of the trial. It is difficult to discern what prejudice may have inured to Smith from this extremely limited foray into his personal drug habits. By the same token, even removing from consideration the inadmissible question concerning drug use, the totality of the evidence against Smith was weighty. The record shows that witnesses testified that in the weeks prior to the hijacking of the Althouse Camaro, Smith discussed the fact that he needed an engine for his used Camaro; that Smith asked Kenny Reed, the third passenger in the car carrying Clemons and Smith, to accompany him to pick up Clemons so that Clemons could get Smith a car; that Smith drove the car while they looked for a car to steal; and that Smith and Reed met Clemons back at Herman Shannon's house after Agent Althouse was killed. The nature and quantity of the evidence inculpating Smith coupled with the lack of prejudice stemming from the improper questions suggests that Smith's substantial rights were not affected. We conclude that the evidentiary error identified by this court does not merit a reversal of Smith's conviction.
 
 
 29
 Accordingly, the convictions of Clemons and Smith are each AFFIRMED.
 
 
 
 [1]
 Clemons proposes several additional grounds for appealing his conviction: the court abused its discretion in admitting his confession into evidence; in failing to give his requested instruction on "a federal officer engaged in the performance of his official duties;" in failing to charge the jury on manslaughter as a lesser included offense; and in denying his motion to sever. Having reviewed the record with respect to these other contentions, we conclude that they are without merit and do not warrant further comment
 
 
 [2]
 R9-495; R14-1430
 
 
 [3]
 R9-491
 
 
 [4]
 R12-1131-1140
 
 
 [5]
 R12-1183
 
 
 [6]
 We note that questions pertaining to Smith's claimed residence during the period in which the events giving rise to this action occurred were properly raised in response to answers submitted in direct testimony. We therefore address solely the admissibility of the question posed to Smith concerning his past use or sale of drugs