[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 20, 2006
THOMAS K. KAHN
CLERK

No. 05-11249
Non-Argument Calendar

_____

D. C. Docket No. 04-00090-CR-3-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SAMUEL ROY ABRAM,
SHANNON L. HARDEN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(March 20, 2006)**

Before ANDERSON, BIRCH and FAY, Circuit Judges.

PER CURIAM:

Samuel Roy Abram appeals his convictions and combined 648-month

sentence, imposed after a jury found him guilty of three counts of armed bank

robbery, in violation of 18 U.S.C. § 2113(a) and (d), two counts of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). Abram is joined in this appeal by co-defendant Shannon Harden, who appeals her convictions and 188-month concurrent sentences after a jury convicted her of two counts of armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d). Abram and Harden raise several challenges to both their convictions and sentences, each of which is addressed in turn. For the reasons set forth more fully below, we affirm.

A grand jury indicted Abram and Harden on the following charges:[1] (1) armed bank robbery of a Vanguard Bank in Fort Walton Beach, Florida, on November 2, 2002 (Count 1); (2) bank robbery of a Vanguard Bank in Mary Esther, Florida, on July 5, 2003 (Count 2); (3) armed bank robbery of a Compass Bank in Gulf Breeze, Florida, on July 19, 2003 (Count 3); (4) use of a firearm during a crime of violence in conjunction with the robbery of the Compass Bank (Count 4); (5) armed bank robbery of a Wachovia Bank in Gainesville, Florida, on November 12, 2003 (Count 5); (6) use of a firearm during a crime of violence in conjunction with the robbery of the Wachovia Bank (Count 6); and (7) possession

---

[1] Abram was charged with all seven counts, while Harden was not indicted for Counts 4, 6, and 7.

2

of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 2113(a) and (d), 924(c)(1)(A), and 922(g) (Count 7). After a jury trial, Abram was convicted of Counts 1 and 3 through 7, while Harden was convicted on Counts 1 and 3. Both were acquitted of Count 2.

Abram was subsequently sentenced to 264 months for Counts 1, 3, and 5 (robbery), 120 months to run concurrently on Count 7 (possession of a firearm by a convicted felon), and 384 months on Counts 4 and 6 (use of a firearm during a crime of violence), to run consecutively as required by statute. Harden received 188 months' imprisonment on Counts 1 and 3, to run concurrently.

## I. Conviction Issues

### A. Sufficiency of the Evidence

On appeal, Abram and Harden argue that the evidence was insufficient to support their convictions on all counts. Specifically, they argue that none of the bank tellers were able to identify them as the robbers, their DNA was not matched, their fingerprints were not found at any scene, nor was there video surveillance, and the only evidence that they were involved in any way came from Tecumseh Parker and Donovan Abram, convicted felons who implicated Abram and Harden in exchange for leniency at sentencing. As to the brandishing of a firearm during two of the robberies, Abram argues that, while the tellers testified to seeing the

3

weapon, the only evidence that it was Abram came from Parker, who was as likely to be the robber in question as Abram.

We review a challenge to the sufficiency of evidence de novo. United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir.), cert. denied 126 S.Ct. 772 (2005). We examine "the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor." Id. Furthermore, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among the constructions of the evidence." United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997). Finally, we are "bound by the jury's credibility determinations, and by its rejection of the inferences raised by the defendant." United States v. Peters, 403 F.3d 1263, 1268 (11th Cir. 2005).

At the outset, Abram does not challenge his conviction for possession of a firearm by a convicted felon, and, therefore, any argument is deemed abandoned. See United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (holding that a defendant who fails to argue an issue on appeal abandons it).

As to the remaining convictions, Abram challenges the sufficiency of the

4

evidence as to (1) armed bank robbery of Vanguard Bank in Fort Walton Beach, Florida, on November 2, 2002; (2) armed bank robbery of Compass Bank in Gulf Breeze, Florida, and use of a firearm during and in relation to a crime of violence (bank robbery) on July 19, 2003; and (3) armed bank robbery of Wachovia Bank in Gainesville, Florida, and use of a firearm during and in relation to a crime of violence on November 12, 2003. Harden challenges her convictions for the November 2 and July 19 robberies.

In order to establish armed bank robbery, the government was required to prove that the defendant (1) knowingly took from the person or presence money or property then in the possession of a federally insured bank; (2) used force or violence or a means of intimidation; and (3) assaulted or put in jeopardy the life of someone by use of a dangerous weapon or device while taking the property or money. See 18 U.S.C. § 2113(a), (d), (f).

For the use of a firearm during and in relation to the bank robbery, the government had to prove that Abram (1) committed the bank robberies as charged; (2) carried a firearm during the commission of those robberies; and (3) carried the firearm "in relation to" the crime of violence, meaning that the firearm helped facilitate the commission of the crime. See 18 U.S.C. § 924(c)(1)(A).

The evidence in this case, drawing all inferences in favor of the government,

supports both Abram's and Harden's convictions. As to the November 2, 2002, robbery of Vanguard Bank in Fort Walton Beach, the tellers, Melanie Shorey and Karen Johnson, confirmed that a robbery took place, and Parker provided the substantive evidence that it was Abram who had recruited him to participate in the November 2 robbery of Vanguard Bank. Parker testified that Abram committed the robbery in question and then left in an employee's car, later to be picked up by Parker at the back of a shopping plaza. He further testified that Abram was given a key to get into the bank by Harden, who worked there, making this the only robbery not requiring a forced entry. Accordingly, the evidence was sufficient to support Abram's conviction. Furthermore, because Harden aided and abetted the crime by facilitating entry, as well as by providing information about the bank, the evidence was sufficient to support her conviction as well.

Turning to the July 19, 2003, robbery of a Compass Bank in Gulf Breeze, Florida, Parker testified that Abram and he completed the robbery, with Abram carrying a bag out of the bank. Two tellers, Alisha Traywick and Jodi Griffis, confirmed that a robbery took place at the bank, and Griffis specifically testified that the robber put a gun to her back and made Traywick open a safe. Moreover, one of the tellers was familiar with Parker, and testified that the robber's voice was not his, and she did not believe Parker had committed the crime, even though he

6

was charged. Thus, the charges in counts 3 and 4, armed bank robbery and use of a firearm in relation to a crime of violence, were both sufficiently proven as to Abram. The testimony implicating Harden was that she was in a room with Parker and Abram when the robbery was discussed, bought and brought a saw blade upon Parker's request, facilitating entry, and waited and watched from a parking lot while the robbery took place. Thus, the charges in count 3 were sufficiently proven as to Harden.

Finally, as to the Wachovia Bank in Gainesville, Parker testified that, on November 8, 2003, Abram cut a hole in the roof of the bank, but left the scene and returned four days later, on November 12, and emerged carrying a duffel bag full of money. Abram's wife, Tiffany Abram, testified to seeing her husband counting a large sum of money that morning with Parker. Two Wachovia bank tellers, Natalie Antoinette Chung and Cindy Acevedo, confirmed the robbery on November 12, and Chung testified that the robber pointed the gun at her and ordered all of the employees to march across the lobby and lay on the ground, where their hands were tied behind their back. Thus, Counts 5 and 6 were sufficiently proven as to Abram.

The core of Abram and Harden's argument is that Parker is of dubious credibility and had a motive to implicate them in order to curry favor with the

7

government with respect to his sentences on the same robberies. As noted above, however, we are "bound by the jury's credibility determinations, and by its rejection of the inferences raised by the defendant." Peters, 403 F.3d at 1268. Abram's and Harden's attorneys cross-examined Parker, and brought out the potential problems with his credibility, and the jury was instructed as well about Parker's potential motivation to lie.

As we have held, "judgment of acquittal . . . is not required because the government's case includes testimony by an array of scoundrels, liars and brigands." United States v. Hewitt, 663 F.2d 1381, 1385 (11th Cir. 1981). "The jury [is] free to disbelieve the . . . government witnesses whose faults were exhaustively catalogued by the attorneys . . . . Furthermore, the trial judge fully instructed the jury on the degree of suspicion they should entertain when considering the testimony. . . ." Id. (citations omitted). The jury in this case believed Parker in spite of his credibility problems, and we are bound by that determination. Thus, the evidence in this case was sufficient to support the convictions.

Moreover, Harden testified on her own behalf in this case, refuting the evidence of her participation. As we have held, "when a defendant chooses to testify,[s]he runs the risk that if disbelieved the jury might conclude the opposite of

[her] testimony is true." United State v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). "[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." Id. Here, it was the jury's province to gauge Harden's credibility, and it was free to disbelieve her testimony. See Peters, 403 F.3d at 1270 ("[i]t is the jury's prerogative to disbelieve a defendants testimony. . . ." (quotation and citation omitted). Thus, we conclude the evidence was sufficient to support the convictions.

### B. Marital Privilege

Next, Abram argues that the district court erred by allowing the testimony of his wife in the absence of a valid waiver of the marital privilege clause, in violation of the Equal Protection Clause. Abram argues that the Supreme Court, in Trammel v. United States, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), "opened the flood gates for husband and wife to be pitted against one another at the behest of the government using leverage of prosecution and offers of leniency to the testifying spouse." He further argues that married people are "treated differently whether speaking or merely observing." Abram explains that a testifying spouse's observations will always come into play, and that the government now has unfettered leverage to secure the testimony of the uncharged spouse, and, therefore, the common law protection of the sanctity of marriage had become non-existent.

We review a district court's ruling on a claim of evidentiary privilege for abuse of discretion, and any factual findings for clear error. See United States v. Singleton, 260 F.3d 1295, 1301 (11th Cir. 2001); accord United States v. Westmoreland, 312 F.3d 302, 306 (7th Cir. 2002) (holding that a district court's ruling on the applicability of marital privilege is reviewed for abuse of discretion).

"There are two recognized types of marital privilege: the marital confidential communications privilege and the spousal testimonial privilege." Singleton, 260 F.3d at 1297, citing Trammel v. United States, 445 U.S. 40, 50-51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). In Trammel, the Supreme Court held that the testimonial privilege may be asserted by the witness-spouse only, and if the witness spouse chooses to testify adversely, even predicated upon the grant of immunity and a promise of leniency, the testimony remains voluntary. Trammel, 445 U.S. at 50-53, 100 S.Ct. at 912-14. Here, Tiffany Abram chose to testify, and, therefore, the testimonial privilege is inapplicable.

The marital communications privilege, on the other hand, excludes information privately disclosed between husband and wife in the confidence of the marital relationship. Id. at 51, 100 S.Ct. at 912-13. However, the privilege does not apply to communications made in the presence of third parties, and generally applies only to utterances, not acts. Pereira v. United States, 347 U.S. 1, 6, 74

10

S.Ct. 358, 361-62, 98 L.Ed. 435 (1954).  It also does not apply to conversations between husband and wife about crimes in which they are jointly participating. United States v. Entrekin, 624 F.2d 597, 598 (5th Cir. 1980).

In the case at bar, Tiffany Abram testified to what she observed, namely that Parker and her husband, Abram, were counting a large sum of money in November 2003, and, therefore, it was not an abuse of discretion to admit this evidence, as it was valid under the testimonial privilege and not barred by the marital communications privilege.  As for her testimony that Abram asked her to see if there was any activity at the Wachovia Bank, located across from her place of employment, this statement by Abram was made in Parker's presence, and, therefore, not barred by the marital communications privilege.  Pereira, 347 U.S. at 6, 74 S.Ct. at 361.  Finally, as for her phone call to tell her husband that police were still at the bank, the important portion of this testimony was what she observed, namely police at the Wachovia Bank.  Because what she observed was admissible, the fact that she testified to what she told her husband, even if it were in violation of the marital privilege, was harmless error because that testimony had no effect whatsoever on the outcome of the case.  See, e.g. United States v. Gunn, 369 F.3d 1229, 1236 (11th Cir.), cert. denied 125 S.Ct. 324 (2004) (holding that a district court's erroneous ruling on the admissibility of evidence will not be

11

reversed unless the error has a substantial impact on the outcome).

Lastly, to the extent that Abram argues that the current status of the marital privilege results in an equal protection violation as applied to utterances versus observations and acts, this was not Abram's objection at trial, and we will review for plain error only. See United States v. Dennis, 786 F.2d 1029, 1042 (11th Cir. 1986) (holding that, where defendants appealed admissibility of testimony on a different ground than that raised in district court, review was for plain error).

"An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.), cert. denied 125 S.Ct. 2935 (2005) (quotation and citation omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. Furthermore, in order for an error to be plain, it must be clear under current law. See United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000). We have also held that "where neither the Supreme Court nor this Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue." Id. Neither the Supreme Court, this Court, nor any other circuit, has resolved the equal protection issue

12

raised by Abram in this appeal. Accordingly, we conclude that any possible error could not have been plain.

## C. Hearsay Evidence and Rule 801(d)(2)(E)

Harden argues that the district court, over her objection, permitted witness Tecumseh Parker to testify to matters that co-defendant Abram told him, such as that Harden was the inside person for Vanguard Bank and would provide a key and informed him and Abram about the security and the alarm system. She further argues that Parker's testimony regarding a letter Abram sent to him while in prison, specifically mentioning her, was also inadmissible hearsay evidence. Specifically, she argues that she was not given an opportunity to cross-examine Abram about those statements, and, therefore, the statements should have been excluded under the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

We review the admissibility of evidence for abuse of discretion. United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002) (reviewing the admissibility of hearsay evidence under Fed.R.Evid. 810(d)(2)(E)). Under Federal Rule of Evidence 801, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). However, a statement is not

13

considered hearsay if the statement is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

We use "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." Miles, 290 F.3d at 1351. Furthermore, a conspiracy need not be charged to make the statement admissible under the exception. See United States v. Bowe, 221 F.3d 1183, 1193 (11th Cir. 2000). In order to be admissible under Rule 801(d)(2)(E), "the government must prove by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement was made during the course and in furtherance of the conspiracy." Miles, 290 F.3d at 1351.

Here, we conclude that admitting Parker's testimony regarding Abram's statements about Harden under the co-conspirator exception was not an abuse of discretion. While no conspiracy was charged in the indictment, the evidence in the case demonstrated, by a preponderance of the evidence, that Harden, Parker, and Abram, agreed to rob, and acted on that agreement to rob, the Vanguard Bank where Harden worked. Harden did, in fact, have a key to get into the bank through the employee's door in the back, and Abram's statement to Parker that he had

14

Harden's key was made in furtherance of that conspiracy. Therefore, the district court did not abuse its discretion by admitting the statement at trial.

As to Harden's Crawford argument, she did not object on the basis of Crawford, but did object that she was unable to cross-examine Abram about his statement, as he was a participant and co-defendant at trial. Assuming without deciding that our review is de novo, and not plain error as the government urges, there was no error here.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. As we explained in Cantellano, the Supreme Court, in Crawford, "explained that the founding generation understood the right to confrontation in the light of the common-law tradition of 'live testimony in court subject to adversarial testing.'" United States v. Cantellano, 430 F.3d 1142, 1145 (11th Cir. 2005). "The common-law tradition of confronting one's accusers in court recognized that ex parte testimony raised issues of justice and fairness. Because testimony is accusatory and delivered in contemplation of criminal proceedings, it is adversarial. An accused, therefore, should have the opportunity to confront adverse witnesses face-to-face." Id., citing Crawford, 541 U.S. at 43-45, 124 S.Ct. at 1359-60.

15

However, Crawford dealt with testimonial "hearsay," and the statements of co-conspirators are expressly excluded from the definition of hearsay under Rule 801(d)(2)(E). Fed.R.Evid. 801(d)(2)(E); United States v. Jenkins, 419 F.3d 614, 618 (7th Cir. 2005) (persuasively holding that nothing in Crawford altered the admissibility of co-conspirator statements); see also Crawford, 541 U.S. at 56, 124 S.Ct. at 1367 (discussing the common law exceptions to hearsay statements that are not testimonial, such as "statements in furtherance of a conspiracy").

As to the letter, Harden argues that it could not have been admitted under the co-conspirator exception because the conspiracy had terminated at that point. A defendant is "deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial." United States v. Thayer, 204 F.3d 1352, 1354 (11th Cir. 2000), citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, we have held that " admission of a codefendant's statement is not error under Bruton where the statement was not incriminating on its face, and became so only when linked with evidence introduced later at trial." United States v. Arias, 984 F.2d 1139, 1142-43 (11th Cir. 1993). "Thus, [f]or Bruton to apply, a codefendant's statement must be clearly inculpatory standing alone." Id.

The letter at issue was mailed by Harden, but that, standing alone, does not

16

incriminate her. The only mention of Harden in the letter is the following: "Shannon has stayed by our side because she knows what's true and what's not." The fact that Harden mailed the letter and is mentioned as staying by their side does not implicate her in any crime. Accordingly, admission of the letter at trial was not an abuse of discretion.

### D. 404(b) Evidence of Uncharged Crimes

Abram and Harden next argue that the district court erred by admitting the testimony of numerous witnesses regarding uncharged, other robberies under Rule 404(b). They argue that the government's purposes for offering the evidence, intent and absence of mistake, were pretextual, and that state of mind or mistake were never at issue. While conceding that the similarities of the other acts to the charged conduct outweighs the differences, Abram and Harden argue that the similarities mirror many other robberies. Finally, they argue that, notwithstanding the curative instructions, the evidence was more prejudicial than probative, and should have been excluded.

We review the district court's rulings on admission of evidence for an abuse of discretion. United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000). "The abuse of discretion standard has been described as allowing a range of choice for the district court, so long as that choice does not constitute a clear error of

17

judgment." United States v. Kelly, 888 F.2d 732, 745 (11th Cir. 1989).

Rule 404(b) provides that evidence of "other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Thus, extrinsic evidence of uncharged, criminal activities generally is considered inadmissible for proving that the defendant acted the same way in the charged offense, but is admissible if used for another purpose, such as to establish intent. Fed.R.Evid. 404(b).

In evaluating the admissibility of 404(b) extrinsic evidence, this Court must determine whether: "(1) the evidence is relevant to an issue other than defendant's character; (2) there is sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the extrinsic act; and (3) the evidence possesses probative value outweighing any prejudicial effect." United States v. Clemons, 32 F.3d 1504, 1508 (11th Cir. 1994). "When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused." Id. The probity of evidence of other crimes offered to prove a similar modus operandi "depends upon both the uniqueness of

18

the modus operandi and the degree of similarity between the charged crime and the uncharged crime." United States v. Myers, 550 F.2d 1036, 1045 (5th Cir. 1977). "Of course, it is not necessary that the charged crime and the other crimes be identical in every detail." Id.

The evidence in question in this case consisted of testimony regarding other, uncharged robberies, committed in Bogalusa, Louisiana, Montgomery, Alabama, and Dothan, Alabama. As to the Bogalusa, Louisiana, bank, Parker testified that Abram, using a ladder, gained entry to the building through the roof. A teller from that robbery, which occurred right after the bank opened on a Saturday, testified that the robber wore all black, a ski mask, latex gloves, and wielded a gun. After getting money, the robber then took the VCR tape, and used a walkie-talkie to contact people. Parker also testified to a thwarted robbery attempt in Dothan, Alabama, also involving entry through a roof. In addition, Parker gave testimony regarding the February 28, 2004, attempted robbery of a bank in Montgomery, Alabama. The circumstances of that robbery involved cutting a hole into the roof, but was thwarted after they were noticed by a security guard.

Donovan Abram, moreover, gave more specific testimony regarding the Dothan, Alabama, robbery. He and Abram wore all black clothing, and wore "Scream" masks to cover their faces. They cut a hole in the roof, used walkie-

19

talkies to communicate with Harden in her truck, and aborted the operation when the hole they cut was too small to fit through and the walkie-talkie batteries died.

As to the February 2004 attempted robbery in Montgomery, Alabama, Donovan testified that Abram, Parker, and he all wore black with masks, and Donovan used a ladder to climb to the roof, but was forced to abort when a security guard showed up. Contents of a bag left contained an acetylene torch, walkie-talkie, latex gloves, and a .45 caliber handgun. Evidence seized from Harden's apartment following the thwarted robbery included (1) a plastic case for walkie-talkies; (2) a package of zip cables or cable ties; (3) an M & C Army Surplus receipt; and (4) brown gloves and two wave caps. An M & C Surplus receipt was also found in Abram's truck, indicating the purchase of, inter alia, a camouflage pack and a ski mask. Also found was a pistol cleaning rod for the .45 caliber handgun found in the bag at the crime scene. An FBI toolmark expert later testified that certain flex cuffs found at the crime scene matched the mold of the flex cuffs discovered in Harden's apartment.

As to the robberies actually charged, a teller from the Vanguard Bank robbed on November 2, 2002, testified that the robber, who confronted her immediately after she opened the bank, was fully clothed, showing no skin, and wielded a gun. The robber used zip-ties to tie the hands of the bank employees. It

20

was discovered later that the robber had removed the cables for the VCR surveillance system. The Vanguard Bank, where Harden worked, was the only bank that showed no evidence of forced entry. According to Parker, this was because Harden had given Abram her key to the bank.

Similarly, at the July 19, 2003, Compass Bank robbery in Gulf Breeze, a teller testified that, right after opening the bank, a robber wearing full black and a ski mask appeared with a gun demanding entry into the vault. The robber tied up the other employees, and specifically asked where the surveillance equipment was located. It was determined that the robber had gained entry by cutting a hole in the roof and repelling on a rope to the floor below. Several plastic ties were found in the bank, and two more were found on the floor of the teller's car. The tag from a vehicle next door was found to have been removed, and a ladder, along with some power tools, were stolen from a truck on the day of the robbery.

As to the November 12, 2003, robbery of Wachovia Bank in Gainesville, a teller testified that, shortly after opening, a robber appeared wearing all black and wielding a gun.. The other employees' hands were tied behind their backs, and the robber demanded to know where the cameras and VCR equipment were located. Another teller testified that she recalled seeing the robber wearing a "Scream" mask and carrying several VCRs. It was determined that entry had been made

21

through the roof, using a rope to reach the floor.

On the basis of the foregoing, it cannot be said that the district court abused its discretion by admitting the extrinsic, uncharged acts into evidence. First, the uncharged acts were very similar in nature to the charged acts. With the exception of the one bank accessed by key, entry was made through the roof, on Saturday mornings, with the robberies occurring shortly after the banks opened. The robber wore all black, covered his face with a ski mask, and in at least two instances, a "Scream" mask. Each time, he wielded a gun, tied up the hands of the employees, and demanded to know the location of VCR equipment or simply took the equipment. Walkie-talkies were the mode of communication, and other similarities emerged as well, such as using ladders to access the roofs, and stealing tags to mask the getaway vehicle's true owner.

Abram and Harden concede that the similarities outweigh the differences in this case, but urge that, where the materials used are commonly used by bank robbers, then there could be nothing idiosyncratic about the modus operandi, and, therefore, the admission of the evidence was in error, citing United States v. Lail, 846 F.2d 1299, 1301 (11th Cir. 1988). In Lail, we held it was an abuse of discretion to permit eyewitness identification of a defendant in an uncharged robbery, offered as rebuttal to the defendant's alibi, where there were "major

22

dissimilarities" between the charged and uncharged offenses. Id. While four common denominators were present: a lone gunman, a handgun, a lack of disguise, and a proximity in time, the Court was unpersuaded that those similarities were enough to justify admission of the eyewitness identification, as the first three traits common to many robberies, and the proximity of time was insignificant. Id.

The dissimilarities in Lail, however, were as follows: (1) in the uncharged crime, the robber used dynamite, not a handgun; (2) in the uncharged crime, the robber posed as a businessman and made two trips to the bank, while in the charged crimes, the robber wore jeans and a t-shirt and made only one trip; (3) in the uncharged crime, the robber took a hostage, while in the charged crimes, no hostages were taken; and (4) the uncharged crime took place 150 miles away from the location of the charged crime. Id. Lail is distinguishable because in the present case very few distinguishing features exist. In each robbery, a lone person, communicating by walkie-talkie, uses a ladder to get onto the roof, where a hole is then created for entry. Furthermore, the entry is done to coincide with the opening of the bank on a Saturday, and in each instance, a man dressed in full clothing, including a mask, wields a gun, demands the vault be opened, ties up the employees, and subsequently takes surveillance equipment with him. Accordingly, taken as a whole, the evidence was offered for a relevant and permissible purpose:

23

to prove a similar modus operandi.

Furthermore, as to Harden, by pleading guilty and affirmatively testifying that she was not involved in any of the charged robberies, placed intent at issue in the case. The court's admission at trial of the government's evidence that Harden participated in other, uncharged robberies, was not, therefore, an abuse of discretion.

As for the adequacy of proof, eyewitness participants in the robberies testified that Abram was present and committed to completing the uncharged acts, and that Harden was a participant as well. This evidence was sufficient for the jury to believe that the defendant committed the extrinsic acts in question.

Finally, as to the probative value and prejudicial effect, the government had no eyewitness identification of Abram or Harden as the robber with the exception of the testimony of convicted felons with a motive to lie to curry the government's favor. As we have held in the drug context, where the credibility of the government's witnesses is suspect, the need for 404(b) evidence is heightened. United States v. Calderon, 127 F.3d 1314, 1332 (11th Cir. 1997). By demonstrating the similarities of other crimes in which Abram and Harden were implicated, the government's evidence helped establish Abram and Harden as the likely perpetrators in the charged crimes despite the lack of an eyewitness

24

identification.

Furthermore, the district court gave several limiting instructions to the jury in this case, repeated again during the closing argument. As proof that the jury did not, contrary to Abram and Harden's assertions, consider the 404(b) evidence as the focus of the trial, or convict Abram and Harden for the uncharged conduct along with the charged conduct, the jury acquitted both of them of Count 2, an attempted robbery of a Vanguard Bank in Mary Esther, Florida. Thus, the court's limiting instructions minimized any potential prejudice, and the jury appears to have followed those instructions. See United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir. 1996) ("We presume that a jury follows the court's instructions.).

## II. Sentencing Issues

### A. Grouping

Abram and Harden also argues that their multiple robbery convictions should have been grouped under § 3D1.2(c) because each count involved the same enhancements. They admit that they could find no case law contradicting or supporting their claim.

This Court reviews de novo a district court's decisions regarding grouping. United States v. Williams, 340 F.3d 1231, 1244 (11th Cir. 2003). As to the rules regarding grouping, § 3D1.2 provides that, in general, counts involving

substantially the same harm shall be grouped together into a single group. U.S.S.G. § 3D1.2. Counts embody substantially the same harm within the meaning of the rule when, <u>inter alia</u>, "one of the counts embodies conduct that is treated as a specific offense characteristic in . . . the guideline applicable to another of the counts." <u>See</u> U.S.S.G. § 3D1.2(c). The intent of § 3D1.2(c) was to prevent "double counting." U.S.S.G. § 3D1.2, comment. (n.5). However, counts can also involve "substantially the same harm" under § 3D1.2(d) where the offense level is determined on the basis of, <u>inter alia</u>, the total amount of harm or loss, or if the behavior is ongoing or continuous in nature. U.S.S.G. § 3D1.2(d). The guideline applicable to robbery, § 2B3.1, is specifically excluded from the operation of subsection (d). U.S.S.G. § 3D1.2(d). Furthermore, the application notes for subsection (d) explicitly state as an example that, in an instance where a "defendant is convicted of three counts of bank robbery. . . . [t]he counts <u>are</u> <u>not</u> to be grouped together." U.S.S.G. § 3D1.2, comment. (n.6)(ex. 9).

In the instant case, it cannot be said that the district court erred by refusing to group the robberies together. As a preliminary matter, a review of Harden's PSI objections indicates that Harden believed § 3D1.2(c) would apply because at least one specific offense characteristic from one count of the robbery was also included in another count of a different robbery. This argument misconstrues the purpose of

26

§ 3D1.2(c) because the fact that two separate robberies, involving different victims, also occurred in such a manner as to involve the same offense characteristics is not the same as, for example, "use of a firearm in a bank robbery and unlawful possession of that firearm," which would warrant grouping the counts under § 3D1.2(c). See U.S.S.G. § 3D1.2(c), comment. (n.5). Thus, Abram and Harden's argument lacks merit, and the district court did not err by not grouping their robberies together.

### B. Obstruction of Justice and Physical Restraint

Abram and Harden argue that the district court should not have enhanced their sentences two levels for obstructing justice. Harden argues it was not warranted based solely on a conflict between her testimony and the testimony of government witnesses, Parker and Donovan Abram, both of whom were convicted felons. Additionally, Abram and Harden together argue that the application of an obstruction enhancement, as well as an enhancement for physical restraint of a teller, violates their Sixth Amendment right to a jury in light of Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

We review a district court's factual findings in support of a § 3C1.1 obstruction of justice enhancement for clear error, and its application of the

27

guidelines to those facts <u>de novo</u>.  <u>United States v. Vinton</u>, 429 F.3d 811, 818 (11th Cir. 2005).  Because Abram and Harden preserved their <u>Booker</u> objection, this Court will review <u>de novo</u>.  <u>United States v. Phillips</u>, 415 F.3d 1288, 1293 (11th Cir. 2005).

As to the obstruction enhancement, Sentencing Guideline § 3C1.1 provides for an upward adjustment of two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to the defendant's offense of conviction."  U.S.S.G. § 3C1.1 (2004).  Among other things, the commentary to § 3C1.1 states that the enhancement is appropriate where a defendant threatens, intimidates, or otherwise unlawfully influences a co-defendant, witness, or juror, directly or indirectly.  <u>Id.</u>, comment (n.4)(a).

The evidence in this case supporting Abram's enhancement included Abram's letter to Parker, written while he was in prison, stating that the police had persuaded Donovan to tell lies, that he thought Donovan and Tiffany were up to something, and admonishing Parker to "stay strong the choice is yours."  Parker also stated that Abram had told him that, if anyone in the "crew" got caught, Abram would take a life.  In addition, Tiffany Abram, in an interview with a

28

probation officer, stated that Abram had told her not to say anything to law enforcement if asked about the bank robberies. The district court found that this evidence was true, and this finding was not clearly erroneous, making the application of the obstruction enhancement valid as to Abram.

As for Harden, she testified under oath, and specifically refuted any involvement in the July 19, 2003, robbery of a Compass Bank, as testified to by Parker. The fact that Parker was a convicted felon was brought to the jury's attention, as well as the court, but the jury rejected Harden's testimony and convicted her on the basis of Parker's sworn statements. In light of her conviction on this count, the district court did not err by enhancing her sentence two levels under § 3C1.1.

To the extent Abram and Harden argue that the district court's factual findings and enhancements for obstruction and physical restraint of a teller violated their Sixth Amendment right to a jury in light of Booker, this argument lacks merit. We have held that, post-Booker, a district court does not violate a defendant's Sixth Amendment rights when it makes factual findings beyond the verdict by a preponderance of the evidence under an advisory guidelines system. See United States v. Chau, 426 F.3d 1318, 1323-24 (11th Cir. 2005). Here, the district court correctly found that the guidelines were purely guidelines and applied the

29

guidelines in an advisory fashion. Therefore, there was no constitutional error regarding either the obstruction or physical restraint enhancements.

## C. Minor-Role Reduction for Harden

Harden argues that the district court should have granted her a minor role reduction under § 3B1.2 because, although her actions were more than minimal, they were minor compared to the other participants, and Harden never physically entered a bank, carried a gun, or received money from the robberies.

"[A] district court's determination of a defendant's role in the offense is a finding of fact to be reviewed only for clear error." United States v. Rodriguez De Varon, 175 F.3d 930, 937 (11th Cir. 1999). Under U.S.S.G. § 3B1.2(b), a defendant qualifies for a two-level reduction to his offense level if he was a minor participant in the offense. U.S.S.G. § 3B1.2(b). The guidelines further define a minor participant as one "who is less culpable than most other participants, but whose role could not be described as minimal." Id., comment. (n.5).

As we clarified in De Varon, when determining whether a minor-role reduction is warranted, a district court should consider (1) whether the defendant played a minor role in relation to the relevant conduct for which he was held accountable and (2) where appropriate, the culpability of the defendant as measured against that of other participants in the relevant conduct. De Varon, 175

F.3d at 940, 944.

In this case, the relevant conduct Harden was held accountable for included the November 2, 2002, robbery of Vanguard Bank, where she worked, and the evidence showed that Harden provided a key for Abram to gain entry and provided him details about the bank's security. The second robbery was of a Compass Bank on July 19, 2003, during which Harden was contacted about a new saw blade, which she purchased and provided to Abram and Parker so that they could gain entry to the bank. Based on the foregoing, it cannot be said that the district court clearly erred by declining the invitation to reduce Harden's guideline calculations. Gaining entry to a bank is a crucial part of any potential robbery, and Harden provided the means in both convictions. Accordingly, the denial of a minor-role reduction was not erroneous.

### D. Reasonableness

Lastly, Abram and Harden argue that their sentences are unreasonable. Abram specifically argues that his 54-year total sentence was unreasonable because a lesser sentence of 32 years, the combined statutory minimum on the use of a firearm during a crime of violence convictions (Counts 4 and 6), was sufficient to ensure accountability and punishment. Harden argues that her 188-month concurrent sentences were unreasonable. Lastly, they argue that "reasonableness"

31

is not the proper standard for reviewing sentences because it is unpredictable and permits judges too much discretion to manipulate sentences based on factors of unknown weight.

Post-Booker, we review a defendant's final sentence for unreasonableness in light of the sentencing factors set forth at 18 U.S.C. § 3553(a).[2] United States v. Winingear, 422 F.3d 1241, 1244-45 (11th Cir. 2005); see also Booker, 543 U.S. at ___, 125 S.Ct. at 766-67 ("Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.").

As for Abram, the record in this case reflects that the court considered the § 3553(a) factors as well as the guidelines and the required statutory sentences, and found a sentence at the middle of the guidelines range appropriate for the robbery counts because there were no aggravating or mitigating circumstances not already contemplated by the guidelines. The court found that a mid-range sentence would

___

[2] Accordingly, Abram and Harden's argument that reasonableness is not the proper standard for reviewing sentence is meritless, as the Supreme Court has expressly directed that sentences be reviewed for reasonableness. While they are correct that the now-advisory nature of the guidelines and unreasonableness review give judges more sentencing discretion than they had before Booker, creating the specter of unpredictability, these concerns are more properly directed at Congress, as we cannot overrule the Supreme Court. See, e.g., United States v. Thomas, 242 F.3d 1028, 1035 (11th Cir. 2001) ("we cannot overrule Supreme Court decisions.").

meet the general goals of punishment, and "given the circumstances of these cases, the victim impact statement and all the factors associated with it," found the sentence to be reasonable. It also imposed a 120-month sentence on the charge of being a convicted felon in possession of a firearm, and ran it concurrent with the robbery counts. Finally, as to the remaining counts, consecutive sentences of 7 and 25 years were required to be imposed by law, which the court did. It is noted that the total sentence of 648 months, or 54 years of imprisonment, is a lengthy sentence, and that 32 years of that sentence were required by law, and Abram pointed this out to the district court and argued that the 32 years alone was a sufficient sentence by itself for all the crimes. However, it cannot be said that it was unreasonable of the court to sentence Abram on each of the counts of conviction in order to penalize Abram for the robberies as well as the firearms convictions.

As for Harden, the record reflects that the court considered the § 3553(a) factors as well as the guidelines, and found a sentence at the low end of the guidelines range appropriate, and a longer sentence unnecessary to meet the goals of sentencing for Harden's robbery counts. Having properly considered the factors and the advisory nature of the guidelines, it cannot be said that Harden's sentence of 188 months' imprisonment was unreasonable.

33

## III. Conclusion

In light of the foregoing, we conclude that the district court committed no reversible error regarding the admissibility of evidence or sufficiency of the evidence. Furthermore, we conclude that the district court properly calculated the guidelines for Abram and Harden, correctly considered the guidelines as advisory only, and imposed sentences for Abram and Harden that were not unreasonable. We, therefore, affirm Abram's and Harden's convictions and sentences.

**AFFIRMED.**