[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 14, 2005
THOMAS  K. KAHN
CLERK

No. 04-15629

_____

D. C. Docket No. 03-00023-CR-TWT-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MIGUEL ANGEL DIAZ-BOYZO,
a.k.a. Salvador Zetina,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(December 14, 2005)**

Before BIRCH, HULL and BOWMAN[*], Circuit Judges.

_____

[*]Honorable Pasco M. Bowman, II, United States Circuit Judge for the Eighth Circuit,
sitting by designation.

PER CURIAM:

After a jury trial, Miguel Angel Diaz-Boyzo was convicted of distributing methamphetamine and carrying a firearm in relation to a drug-trafficking crime. On appeal, Diaz-Boyzo argues that the evidence against him was insufficient to support the convictions. After review and oral argument, we AFFIRM.

## I. BACKGROUND

A. Factual Background

Diaz-Boyzo was indicted in connection with an alleged conspiracy to distribute cocaine and methamphetamine involving Leonel Villa-Gamino, Eustolio Villa-Gamino, and Aurelio Ortiz-Zagada. According to the testimony at trial, the investigation into the conspiracy began when a confidential informant ("CI") under the direction of agents of the Drug Enforcement Administration ("DEA") and Georgia Bureau of Investigation ("GBI"), met with GBI Special Agent Charles Butler on 13 November 2002. The CI informed Agent Butler that he had met with Leonel Villa-Gamino on 6 November 2002 to discuss the sale of one pound of methamphetamine to the CI for $4,000. At his 13 November 2002 meeting with Agent Butler, the CI agreed to assist in the investigation of Leonel Villa-Gamino's drug-trafficking activities.

Through a series of telephone calls and meetings monitored by Agent Butler

either visually or by recording devices, the CI and Leonel Villa-Gamino arranged to meet on 15 November 2002, so that Villa-Gamino could provide the CI with samples of cocaine and/or methamphetamine. At the meeting, Leonel Villa-Gamino arrived with two men whom he introduced as his brothers, one of whom was later identified as Eustolio Villa-Gamino. Leonel Villa-Gamino and the CI discussed Villa-Gamino's drug business. Villa-Gamino gave the CI a sample of cocaine and set the price for a pound of methamphetamine at $3,800. The CI and Leonel Villa-Gamino agreed that the CI would contact Villa-Gamino the following week.

On 19 November 2002, the CI arranged a meeting with Leonel Villa-Gamino at the Waffle House. Agent Butler attended the meeting in an undercover capacity. Villa-Gamino gave Agent Butler and the CI a sample of methamphetamine, and they discussed future purchases.

On 9 December 2002, Agent Butler and the CI again met with Leonel Villa-Gamino, who gave them a sample of crystal methamphetamine. Villa-Gamino then had the CI and Agent Butler follow him back to Huntington Creek apartments and instructed them to stay there and await a telephone call from him when he was ready to close the deal. Eventually, Leonel Villa-Gamino called the CI, informed him the shipment had not arrived, and suggested they meet for coffee at the Waffle

House. At the Waffle House, Leonel Villa-Gamino explained that his brother was driving the drugs from California. At around 9:00 p.m., Leonel Villa-Gamino received a telephone call from someone he identified as his brother, and he instructed the CI and Agent Butler to meet him at the apartments in fifteen minutes. Back at the apartments, Leonel Villa-Gamino sold one pound of methamphetamine to Agent Butler for $4,500.

On 15 December 2002, arrangements were made for Agent Butler to purchase ten pounds of methamphetamine from Leonel Villa-Gamino the following day. However, Villa-Gamino later contacted the CI and informed him that the deal would be handled by his brother Eustolio instead.[1] On 16 December 2002, the CI and Eustolio Villa-Gamino agreed to meet at the Waffle House. Shortly after the CI and Agent Butler arrived at the Waffle House, around 5:00 p.m., Eustolio Villa-Gamino and Miguel Angel Diaz-Boyzo, the defendant in this case, arrived in a pick-up truck driven by Eustolio Villa-Gamino. While Diaz-Boyzo remained in the pick-up truck, Eustolio Villa-Gamino entered the restaurant to meet with Agent Butler and the CI. In the restaurant, Eustolio Villa-Gamino explained that he would first deliver five pounds of methamphetamine to Agent Butler for cash on delivery and then obtain the additional five pounds for a second

---

[1]Eustolio Villa-Gamino later explained that Leonel Villa-Gamino had returned to Mexico. Leonel Villa-Gamino remains a fugitive.

delivery.

After the meeting in the restaurant, which lasted about fifteen minutes, Eustolio Villa-Gamino left the restaurant and drove his truck, with Diaz-Boyzo still inside it, to the Huntington Creek apartments. Surveillance agents followed them to the apartments. Eustolio Villa-Gamino departed the truck and entered an apartment while Diaz-Boyzo again remained in the truck.

Moments later, agents observed Eustolio Villa-Gamino return to the truck with another person, then drive to Huntington Station apartments with Diaz-Boyzo and the third person as passengers. At this time, only one agent, Agent Walker, was following the truck. Agent Walker drove past the truck to avoid being detected. He later doubled back to observe the truck twice. The first time, the driver's and passenger's seats were occupied; the second time, the driver's seat was empty, but the passenger remained in the truck. Agent Walker later observed Villa-Gamino and Diaz-Boyzo drive away the apartments and head towards the Waffle House. No agent ever saw Diaz-Boyzo leave the truck at any location.

At the Waffle House, Eustolio Villa-Gamino parked next to Agent Butler's truck, in which the CI and Agent Butler were seated. Eustolio Villa-Gamino exited his truck, walked to the passenger side of his truck, and took a white plastic bag from the passenger's side floorboard of the truck. The bag contained a cardboard,

5

Budweiser beer twelve-pack box. Inside the beer box were five wrapped, one-pound packages of methamphetamine, containing a total of 2.237 kilograms of methamphetamine. Eustolio Villa-Gamino handed the bag to Agent Butler, who inspected it.

When Agent Butler confirmed that there was methamphetamine in bags in the beer box, he signaled to agents who moved in and arrested Eustolio Villa-Gamino. When approaching the truck, Special Agent Beard noticed that Diaz-Boyzo was in the truck looking behind him towards Eustolio Villa-Gamino. After assisting in Eustolio Villa-Gamino's arrest, Agent Beard opened the passenger door of Villa-Gamino's truck and saw a weapon near Diaz-Boyzo's hands in his lap. When Diaz-Boyzo was removed from the truck, a gun fell to the ground. The gun was identified as a loaded, Kurz .380 caliber semiautomatic pistol.

B. Indictment

On 11 February 2003, the government filed an indictment against Leonel Villa-Gamino, Eustolio Villa-Gamino, Diaz-Boyzo, and Ortiz-Zagada. The indictment charged Diaz-Boyzo (along with some or all of his codefendants) with: conspiring to possess with the intent to distribute cocaine and methamphetamine (count 1); distributing methamphetamine on November 19, 2002 (count 3); knowingly and intentionally distributing methamphetamine on December 16, 2002,

6

aided and abetted by each other (count 5); carrying a firearm in relation to a drug-trafficking crime on December 16, 2002, aided and abetted by each other (count 6); being an illegal alien in possession of a firearm (count 7); possession with intent to distribute methamphetamine on December 16, 2002 (count 8); and two immigration violations (counts 9 and 10).

The parties subsequently agreed to sever the immigration-related charges in counts 7, 9, and 10,[2] and the government agreed to dismiss count 3, involving the drug sale by Leonel Villa-Gamino, based on insufficient evidence. Thus, Diaz-Boyzo was tried only on counts 1, 5, 6, and 8, all of which related to the drug sale with Eustolio Villa-Gamino on 16 December 2002.

C. Trial

At trial, Diaz-Boyzo contended that he was merely present at the scene of the 16 December 2002 drug deal and did not actively participate in any of the alleged drug-trafficking activities. Diaz-Boyzo asserted that he was present in the truck with Eustolio Villa-Gamino because Villa-Gamino was giving him a ride to pick up a requested advance from his employer, El Milagro Tortilla Factory.

At trial, DEA Agent Shontal Linder testified that she and another DEA Agent interviewed Diaz-Boyzo the day after his arrest. According to Agent

_____

[2]The government ultimately dismissed those charges after Diaz-Boyzo was convicted of charges 5 and 6.

7

Linder, Diaz-Boyzo stated that he did not know anything about the drug activity and that he and Eustolio Villa-Gamino were just going to the Waffle House to eat. When questioned about the gun, Diaz-Boyzo said that some friends gave him the gun because they were going to Mexico, and Diaz-Boyzo was taking it home with him.

Two employees of El Milagro testified about the events of 16 December 2002. Maria Nelson testified that Diaz-Boyzo worked as a part-time deliveryman at El Milagro. On 16 December 2002, Diaz-Boyzo arrived at El Milagro around 8:00 or 8:30 a.m. and asked for his paycheck, although it was not a payday, because he had an emergency relating to his a relative. Nelson's sister, Hermalinda Mandujano, who was in charge of paychecks, was not in. Nelson told Diaz-Boyzo that she would speak with her sister and that Diaz-Boyzo should return later. When Mandujano arrived later in the day, Mandujano told Nelson that she should give Diaz-Boyzo about a hundred dollars for his emergency.

Mandujano's testimony confirmed that she authorized her sister to give Diaz-Boyzo one hundred dollars in cash if he returned on December 16. Mandujano testified that there usually was someone at the office until 5:00 or 6:00 p.m., and she also testified that their business is approximately a three-minute drive from the intersection where the Waffle House is located.

Eustolio Villa-Gamino, who previously had pled guilty to his involvement in the drug conspiracy, also testified at Diaz-Boyzo's trial. Eustolio Villa-Gamino testified that he knew Diaz-Boyzo from El Milagro, where they both worked, and gave Diaz-Boyzo a ride to El Milagro in the morning to pick up his paycheck. Later in the day, Villa-Gamino told Diaz-Boyzo that he would take him back to El Milagro but that he had to do something first.

Eustolio Villa-Gamino further testified that he told Diaz-Boyzo he was going to the Waffle House to get a soda and did not tell him that he was meeting Agent Butler and the CI, nor did he tell Diaz-Boyzo why they were going to the apartment complexes. Eustolio Villa-Gamino also did not tell Diaz-Boyzo that there were drugs in the car. The drugs were in a beer box in a plastic bag in the truck, and Eustolio Villa-Gamino did not tell Diaz-Boyzo that the box contained methamphetamine. Diaz-Boyzo did not tell Eustolio Villa-Gamino that he had a firearm in the car, and they never discussed Diaz-Boyzo providing any protection to Villa-Gamino. When arrested and questioned, Eustolio Villa-Gamino told law-enforcement agents that Diaz-Boyzo knew nothing about the drugs and asked them to let Diaz-Boyzo go. Eustolio Villa-Gamino admitted at trial, however, that other aspects of his post-arrest statement, including the identity of the man from whom he obtained the drugs, were not true. Agent Butler testified at trial that he had

9

never seen Diaz-Boyzo before 16 December 2002 and that to his knowledge Diaz-Boyzo had not been involved in any of the previous meetings or telephone calls.

After a week-long trial, the jury convicted Diaz-Boyzo of distributing at least 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) and 18 U.S.C. § 2 (count 5) and carrying a firearm in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (count 6). The jury acquitted Diaz-Boyzo of conspiracy in count 1 and conspiracy-with-intent-to-distribute in count 8.

Diaz-Boyzo was sentenced to 120 months of imprisonment on the methamphetamine-distribution conviction and to 60 months of imprisonment on the firearm conviction, to be served consecutively. He now appeals his convictions.

## II. STANDARD OF REVIEW

This Court reviews de novo the sufficiency of evidence to support convictions. United States v. Pineiro, 389 F.3d 1359, 1367 (11th Cir. 2004). However, we resolve all reasonable inferences in favor of the jury's verdict. Id. "The evidence is sufficient so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt." Id.

10

## III. DISCUSSION

On appeal, Diaz-Boyzo argues that the evidence at trial failed to support his convictions for methamphetamine-distribution and carrying a firearm in relation to a drug-trafficking crime. We disagree.

### A. Distribution of Methamphetamine

It is well settled that mere presence in a car involved in a drug deal, when the contraband is hidden in the car, is insufficient to support a conviction for distributing or possessing with intent to distribute drugs. See, e.g., United States v. Lopez-Ramirez, 68 F.3d 438, 441 (11th Cir. 1995) (holding that defendant's presence as a passenger in a vehicle carrying drugs and engaging in countersurveillance was not sufficient to establish participation in a conspiracy to distribute cocaine or possession with intent to distribute cocaine); United States v. Stanley, 24 F.3d 1314, 1321 (11th Cir. 1994) (holding evidence insufficient to support conviction when defendant was present in car where drugs were hidden under the dashboard, even though the driver and another person discussed the "dope" in defendant's presence, as there was no evidence defendant heard the conversation and no evidence of a demeanor change).

Mere presence is also insufficient when the government charges the defendant under an aiding-and-abetting theory. United States v. Leonard, 138 F.3d

11

906, 909 (11th Cir. 1998) ("To sustain a conviction for aiding and abetting, the evidence must show that the defendant shared the criminal intent of the principal(s) and committed an overt act in furtherance of the criminal venture."); United States v. Harold, 531 F.2d 704, 705 (5th Cir. 1976) (per curiam) (holding that to aid and abet distribution of drugs, the defendant must actively participate in the distribution).

As stated above, Diaz-Boyzo's presence in Eustolio Villa-Gamino's truck, where Eustolio Villa-Gamino had drugs hidden in a beer box inside a white bag, is insufficient by itself to support his conviction. However, there is more than mere presence in this case. The following evidence, taken together, is sufficient to support Diaz-Boyzo's conviction for distributing methamphetamine under an aiding and abetting theory. First, Diaz-Boyzo rode with Eustolio Villa-Gamino to the initial meeting, the two apartment complexes for the drug pick-up, and the final delivery meeting. Second, when Agent Beard approached the car, Diaz-Boyzo was sitting in the passenger side of the truck and looking back toward Eustolio Villa-Gamino during the delivery of the drugs. Third, Diaz-Boyzo possessed a loaded firearm, which rested near his hands and in his lap, also during the delivery of the drugs. We believe these facts, especially in light of the firearm and its location, would allow a reasonable factfinder to conclude that Diaz-Boyzo served as lookout

and protection for Eustolio Villa-Gamino in the transaction. See United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000) ("All factual and credibility inferences are drawn in favor of the Government."). We also note that the jury was free to disbelieve and disregard Eustolio Villa-Gamino's testimony that Diaz-Boyzo was not involved in the drug transaction and did not serve as protection for him. See, e.g., United States v. Brooks, 703 F.2d 1273, 1277-78 (11th Cir. 1983) (noting that issues of credibility are matters for the jury).

B. Carrying a Firearm in Relation to a Drug-Trafficking Crime

Diaz-Boyzo raises three arguments against his conviction for carrying a firearm in relation to a drug-trafficking crime. First, he contends that this conviction is predicated on his conviction for distribution of methamphetamine and therefore suffers from the same evidentiary deficiencies which attend the distribution conviction. Having previously concluded that there was sufficient evidence for his distribution conviction, we conclude that this argument fails.

As to his second argument, he argues that the evidence fails to establish that he "carried" the firearm within the meaning of 18 U.S.C. § 924(c). We have held that "[a] central and obvious concept inherent in the physical meaning of the word carry is that of some degree of physical transportation or movement." United States v. Mount, 161 F.3d 675, 679 (11th Cir. 1998). In United States v. Young,

13

the defendant had three guns in his car while he transported drugs for a possible sale. 131 F.3d 1437, 1438 (11th Cir. 1997) (per curiam). In that case, no sale was in progress or even imminent when the defendant was arrested and the guns found. Id. We held that the factfinder in that case "could reasonably link the vehicle and the guns to drug trafficking activity in order to satisfy the 'carrying' prong of the statute even though there is no direct evidence of a sale in progress or one that is imminent." Id. at 1439. Here, Diaz-Boyzo's arrival at the Waffle House as a passenger in the targeted truck and his possession of a gun just moments after the five-pound delivery of methamphetamine are sufficiently linked to each other to establish the "carrying" prong of § 924(c).

As to his third argument, Diaz-Boyzo argues that the evidence fails to establish the "in relation to" prong of § 924(c). The Supreme Court has stated that "[t]he phrase 'in relation to' . . . at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Smith v. United States, 508 U.S. 223, 238, 113 S. Ct. 2050, 2058-59 (1993). Given that we have previously concluded that the evidence is this case was sufficient to show that Diaz-Boyzo aided and abetted a drug transaction and that he "carried" the gun to the transaction within the meaning of § 924(c), we have no difficulty in concluding

14

that there was sufficient evidence to show that the gun was there for use if needed during the drug transaction and that the "in relation" prong of § 924(c) is therefore satisfied.

### III.  CONCLUSION

Miguel Angel Diaz-Boyzo appealed his convictions for distributing methamphetamine and carrying a firearm in relation to a drug-trafficking crime. We conclude that the evidence was sufficient to support his convictions.

**AFFIRMED.**