[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 27, 2006
THOMAS K. KAHN
CLERK

No. 05-12782
Non-Argument Calendar

_____

D. C. Docket No. 04-00421-CR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAMON DEPREECE GARRETT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 27, 2006)

Before DUBINA, HULL and FAY, Circuit Judges.

PER CURIAM:

Damon Depreece Garrett is appealing his convictions and sentences for carjacking a motor vehicle, in violation of 18 U.S.C. § 2119, possession of a firearm during and in relation to a carjacking offense, in violation of 18 U.S.C. § 924(c), assault of a federal officer, in violation of 18 U.S.C. § 111(a) & (b), and possession of a firearm during and in relation to an assault of a federal officer, in violation of 18 U.S.C. § 924(c). Garrett argues on appeal that (1) the government's evidence was insufficient to support his convictions for carjacking and assault of a federal officer; (2) the district court either abused its discretion in denying his proposed jury instruction on the legal question whether this federal officer was a "federal agent" for purposes of 18 U.S.C. § 111, or erred in answering this question in the affirmative; and (3) the court committed reversible error, in violation of the Supreme Court's decision in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, when it sentenced him to 512 months' imprisonment. For the reasons set forth more fully below, we affirm Garrett's convictions and sentences.

At trial, Derrick Stewart testified that, at approximately 6:30 p.m., while he was sitting in his blue Ford Explorer in a shopping center parking lot on Moreland Avenue in Atlanta, Georgia, Garrett approached him, drew a pistol, and stated that he was robbing Stewart. When Stewart responded that he had no money, Garrett

2

said, "[s]ince you don't have nothing I ought to just shoot you in the head," and Garrett fired a shot past Stewart's face and into the Ford Explorer. Stewart then emptied his pockets to demonstrate that he had no money, at which time his automatic teller machine ("ATM") banking card fell out of his pocket. Garrett replied that "[w]e fixing to go to the Tilley [ATM] machine." While keeping his pistol pointed at Stewart, Garrett also walked around the front of the Ford Explorer towards the front-passenger door. In the meantime, Stewart jumped out of the vehicle, ran into a grocery store, and reported the incident to a police officer in the store. When Stewart came outside the store with the officer, Stewart saw Garrett drive away in his Ford Explorer. Stewart also testified that he believed that he had to abandon his vehicle to protect his personal safety.

Regina Person also testified during the trial, stating that, while she was driving home that same evening in her Cadillac with her four-year-old daughter, she saw a blue Ford Explorer being driven wildly out of a shopping center parking lot and onto Moreland Avenue. She pulled over to the side of the road to let the person driving the Ford Explorer pass her because she thought the other driver was intoxicated. However, while Person later was driving south on Moreland Avenue towards I-285, the person driving the blue Ford Explorer sideswiped her Cadillac and pulled in front of her.

After the two drivers stopped in the center turn lane that separated the south and north-bound lanes, Person got out of her vehicle, examined its damaged passenger-side door, and then went back to the driver-side door, where she met Garrett, who had been driving the Ford Explorer. Garrett pointed a silver semi-automatic pistol at Person's head and said: "Bitch give me your money . . . if you don't have any money you are going to die today." Person asked Garrett not to kill her in front of her daughter, told him that she did not have any money, and offered to take him to an ATM machine to get him money. Although Garrett accepted this offer, he could not open the damaged passenger door of Person's vehicle. Thus, he started to climb in through the window in the passenger door.

Agent Mark Grant, who was both an officer with the Georgia Department of Motor Vehicles and a Special Deputized U.S. Marshal who worked full-time on the Federal Bureau of Investigation's ("FBI's") Joint Terrorism Task Force in Atlanta ("JTTF"), testified as well, stating that, as a task-force agent, he had to follow FBI policies, including the FBI's policy requiring FBI agents to intervene in violent state or federal crimes that they witness. Agent Grant stated that, as he was heading home from work in an unmarked FBI vehicle that same evening, he was driving slightly ahead of Person and Garrett. While looking in his rearview mirror, Agent Grant saw Garrett sideswipe Person's Cadillac in the Ford Explorer, block

4

her by stopping in front of her in the center turn lane, and get out of the Ford Explorer carrying a silver pistol. Based on this observation, Agent Grant made a u-turn and drove north, passing Person and Garrett. While passing them, Agent Grant saw that Garrett was carrying what appeared to be a small pistol. Agent Grant then made another u-turn, turned on the blue lights in his FBI vehicle, and pulled behind Person's Cadillac.

Agent Grant further testified that, when Person saw him, she ran to him and said: "[h]e's trying to rob me, he's going to kill me, he's got a gun." Agent Grant pulled out his FBI badge that was hanging around his neck, drew his pistol on Garrett, directed Garrett to drop his weapon and to raise his hands, and yelled: "I'm a police officer. I'm a U.S. Marshal. I'm the State Police. FBI." Garrett, however, jumped out of the passenger-side vehicle window of Person's Cadillac and pointed his pistol at Agent Grant. Agent Grant, who was standing approximately five feet from Garrett, did not shoot Garrett because Person also was standing near him, and they were in the middle of a six-lane road during rush hour. Agent Grant, however, believed that his life was in danger.

Additionally, Officer Kevin Colton, a police officer with the Dekalb County Police Department, testified that, during that same evening, he was on patrol on Moreland Avenue when he heard the carjacking report relating to Stewart's Ford

5

Explorer. While Officer Colton was driving north on Moreland Avenue towards the shopping center, he saw Garrett and Agent Grant standing near the Ford Explorer, with their pistols drawn on each other. After Officer Colton drove past them, he turned his vehicle's blue lights and siren, made a u-turn through the median, and stopped near Person's Cadillac. Officer Colton then got out of his vehicle, ordered both men to drop their weapons and raise their hands, and observed that Garrett matched the description of the carjacking suspect. Agent Grant, in turn, stated that Garrett had a gun. Garrett then jumped back into the Ford Explorer and started driving it south on Moreland Avenue towards I-285, while Officer Colton pursued him in his police vehicle, always staying within ten car lengths of the Ford Explorer.

Officer Colton also testified that, during this pursuit, Garrett struck several vehicles and struck a concrete traffic island on his way down the ramp to I-285, resulting in the left front tire of the Ford Explorer exploding. Officer Colton, Agent Grant, and other police officers with the Dekalb County Police Department followed the Ford Explorer at speeds of 70 to 80 miles- per-hour, while Garrett drove with a bare front tire.[1] Garrett exited the highway, he hit a concrete traffic

---

[1] Officer Colton added that the front wheel of the Ford Explorer disintegrated during this chase, resulting in large chunks of it, as well as oil and other parts of the vehicle, flying into Officer Colton's windshield.

island, became airborne, and landed on several other vehicles. When a police officer pulled the front of his vehicle against the driver's door of the Ford Explorer, Garrett jumped out of the window and began running. Officer Colton and Agent Grant stopped Garrett a short distance down the road, took him into custody, and recovered from the front pocket of Garrett's pants a small silver semi-automatic .25 caliber pistol, which had no magazine and no bullets.

Moreover, the record included testimony from Agent Grant and Agent Glenn Graves, a Supervisory Special Agent with the FBI, that the JTTF included 3 FBI agents and approximately 15 agents from state and local agencies who were deputized as Special U.S. Deputy Marshals. After being deputized, Special Deputy U.S. Marshals were authorized to (1) investigate federal crimes, (2) make arrests for the violation of federal criminal laws in Title 18 and Title 28 of the United States Code, and (3) work on the federal terrorism task force. Although the State of Georgia continued to pay Agent Grant's salary and overtime after he joined the JTTF, the FBI reimbursed the state for these expenses, along with paying for Agent Grant's training course on "Basic Terrorism" at the FBI Academy in Quantico, Virginia. Agent Grant worked in an office in the FBI offices in Atlanta, used FBI equipment, drove an FBI vehicle, and reported to FBI Supervisory Special Agent Graves. Agent Graves also testified regarding the daily operations of the JTTF,

7

explaining that "there is no distinction between [Agent Grant] and/or an [FBI] agent on my squad. They both work the same type of cases." Additionally, similar to Agent Grant, Agent Graves testified that JTTF agents were required to follow all of the FBI's policies, including intervening in any violent state or federal misdemeanors or felonies that they witnessed.[2]

Garrett attempted during his cross-examination of Agent Graves to question him on the issue of whether Agent Grant was a "federal officer" within the protections of 18 U.S.C. § 111. The district court, however, stopped this line of questioning, as well as refusing to give a jury instruction on it. In doing so, the court explained that the only issue for the jury to decide was whether Agent Grant was acting within the scope of his duties when he intervened in Garrett's armed robbery of Person.

At the conclusion of the government's case, Garrett moved for a Rule 29 judgment of acquittal on his carjacking offense, arguing that the government had failed to establish that he had the intent to cause death or serious bodily injury when he took Stewart's Ford Explorer. Garrett also sought acquittal as to his

---

[2] The government also introduced into evidence a Special Deputation Appointment, which reflected that Agent Grant took an oath of office for the U.S. Marshals Service in December 2003, and that he had the authority "to perform the duties of the Office of Special Deputy United States Marshal as directed by an appropriate official of the United States Marshals Service or some other appropriate Federal Official as so designated." This form also listed as limits of this authority that he was not authorized to participate in a federal drug task force unless he also was authorized by the Drug Enforcement Agency or the FBI.

8

assault offense, based on his contention that Officer Grant was not acting in his

capacity as a federal officer at the time Garrett assaulted him.  The district court

denied both of these Rule 29 motions.  The court also denied these motions when

Garrett renewed them at the conclusion of the evidence.  The jury subsequently

convicted Garrett of all counts in his indictment.

Garrett's presentence investigation report ("PSI") calculated that, based on a

combined adjusted offense level of 26 and a criminal history category of IV,

Garrett, who was 20 years old at the time of sentencing, had a guideline range of

92 to 115 months' imprisonment for his carjacking and assault offenses.[3]  The PSI

also explained that Garrett faced mandatory minimum consecutive sentences of

120 months' and 300 months' imprisonment for his possession of a firearm in

relation to the carjacking offense and for his possession of a firearm in relation to

the assault offense, respectively.  Garrett's only objection to the PSI was to the

probation officer's failure to recommend a downward departure of at least one

criminal history category under § 4A1.3 because his resulting guideline range

over-represented his criminal history, which included two juvenile convictions.

---

[3] The PSI used the 2003 edition of the Guidelines Manual in calculating Garrett's guideline sentence because use of the 2004 edition may have resulted in an ex post facto violation.  The PSI also discussed that, pursuant to U.S.S.G. § 2K2.4(b), the guideline sentences for Garrett's § 924(c) offenses in Counts 2 and 4 were the minimum term of imprisonment required by the statute.

At sentencing, Garrett renewed his motion for a downward departure for over-representation of criminal history based on his juvenile convictions.[4] The court discussed its discretion and power post-Booker to impose a sentence outside of Garrett's advisory guideline range or to otherwise depart based on unique factors in the case, but declined to grant Garrett's motion for a per se departure based on over-representation. The court explained that it had neither the power nor the desire to rule so broadly on the question of whether juvenile convictions should not count as much as adult convictions. Moreover, although the court later noted that Garrett's total sentence likely was more than Garrett would have received if he, instead, had been prosecuted in state court, and although the court believed that the offenses at issue were "essentially state crimes," the court did not believe that it should impose a lesser sentence based solely on this personal opinion.

The court ultimately sentenced Garrett at the bottom of his guideline range to 92 months' imprisonment, to be served consecutively with his two mandatory minimum consecutive sentences for his § 924(c) offenses of 120 months' imprisonment and 300 months' imprisonment, with a total resulting sentence of 512 months' imprisonment. When the court asked Garrett whether he had any

---

[4] Garrett's PSI summarized his lengthy juvenile history, which (1) began with an adjudication for carrying a concealed weapon at the age of 11, and (2) included Garrett's repeated failures to take advantage of court-provided services.

objections to the court's pronouncement of sentence, Garrett clarified that his only objections were to (1) the over-representation of his criminal history, and (2) that his sentence was excessive in comparison to what he would have received if he had been sentenced in state court.

**Issue 1:** **<u>Whether Garrett had the specific intent to cause death or serious bodily harm of Derrick Stewart during the carjacking of Stewart's vehicle</u>**

Garrett argues that the government produced insufficient evidence to establish that he had the intent to cause death or serious bodily harm when he took Stewart's Ford Explorer, and that the court, therefore, should have granted his Rule 29 motion for a judgment of acquittal on Count 1 and the corresponding § 924(c) offense in Count 2. Garrett contends that no reasonable jury could have concluded that he had this intent because, at the moment he took the Ford Explorer, his firearm had no clip or ammunition, he did not demand either the vehicle or its keys, and Stewart had exited the vehicle. Garrett concludes that the government failed to show a connection between his "hollow" threat of violence during the attempted robbery and his unplanned subsequent taking of the Ford Explorer.

We review <u>de novo</u> the sufficiency of evidence to support convictions. <u>United States v. Diaz-Boyzo</u>, 432 F.3d 1264, 1269 (11th Cir. 2005). We, however, resolve all reasonable inferences in favor of the jury's verdict. <u>Id.</u> "The evidence

11

is sufficient so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt." Id. (quotation omitted).

To successfully convict a defendant of carjacking under § 2119, the government must establish that the defendant:

> [W]ith the intent to cause death or serious bodily harm, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so.

18 U.S.C. § 2119. The intent element of this offense, the only element at issue on appeal, is satisfied when the government establishes that, "at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car." See United States v. Fulford, 267 F.3d 1241, 1244 (11th Cir. 2001) (quoting Holloway v. United States, 526 U.S. 1, 12, 119 S.Ct. 966, 972, 143 L.Ed.2d 1 (1999)). A defendant's intent "is to be judged objectively from the visible conduct of the actor and what one in the position of the victim might reasonably conclude." See Fulford, 267 F.3d at 1244 (determining that sufficient evidence existed for a reasonable jury to conclude that the defendant had the conditional intent to kill or seriously harm the victim if necessary to steal his vehicle when (1) the defendant put a gun to the victim's face and told him to "[g]et the fuck out of the car," (2) the

12

victim testified that he feared for his life, and (3) the defendant testified that he previously had been convicted of armed robbery).

In support of his argument that he lacked the requisite intent for a § 2119 conviction, Garrett cites as persuasive authority to the Third Circuit's decision in United States v. Applewhaite, 195 F.3d 679 (3d Cir. 1999). In Applewhaite, the defendant and his codefendant plotted the murder of his codefendant's former husband, which included luring the victim to his former wife's home, knocking him unconscious, putting him in his own van, and driving away. See Applewhaite, 195 F.3d at 682-83. Determining that this evidence established that the defendants' primary objective was to do harm to the victim and that the defendants' taking of the victim's van was an afterthought in an attempt to move the victim's body away from the crime scene, the Third Circuit concluded that the government had failed to establish the requisite nexus between the intent to serious harm and the taking of the victim's vehicle. See Applewhaite, 195 F.3d at 685.

However, in examining a similar challenge by the defendants on whether their § 2119 convictions were supported by sufficient evidence, we distinguished the facts in Applewhaite. See United States v. Diaz, 248 F.3d 1065, 1096 (11th Cir. 2001). In Diaz, the defendants similarly argued they lacked the requisite intent because their primary objective was to kidnap and extort their victims—not to steal

13

their vehicles—and that they simply took their vehicles as a means of facilitating the kidnaping. See id. at 1095-96. Nevertheless, we determined that the defendants' gaining control of the victims' vehicles was an important step in the defendants' extortion scheme, instead of being an afterthought. See id. at 1096. We also explained that, although the taking of the victim's vehicle was not the primary objective, the government established that the defendants intended to cause the victim serious bodily harm if necessary to steal his vehicle by showing that they approached the victim with weapons, threw him to the ground, blindfolded and handcuffed him, and threw him into the vehicle. See id.

Similarly, in United States v. Kimble, 178 F.3d 1163 (11th Cir. 1999), the defendants came into a restaurant with loaded, semi-automatic pistols, pointed their pistols directly at several of the employees, forced the employees to lie face down on the floor, and hit one employee with a pistol when he refused to cooperate. See id. at 1166. We concluded that, although one of the defendants announced that no one would get hurt if the defendants' instructions were followed, a reasonable jury could have concluded that, based on the defendants' actions throughout a robbery, they "would have at least attempted to seriously harm or kill [one or more of their victims] if that action had been necessary to complete the taking of the car." See id. (quoting Holloway, 526 U.S. at 12, 119 S.Ct. at 972). Moreover, we

14

determined that the victim was sufficiently near to his vehicle when the defendants robbed him of it to sustain their § 2119 convictions. See id. at 1167-68. In reaching this second determination, we explained that the vehicle was parked outside the restaurant and, had the victim not feared for his safety, he could have reached the vehicle and prevented its taking. See id. at 1168.

In the instant case, Stewart testified that Garrett approached him while he was seated in the driver's seat of his Ford Explorer, threatened to rob and shoot him, and fired a shot from his pistol past Stewart's face and into the Ford Explorer. When Garrett saw Stewart's ATM card, Stewart declared "[w]e fixing to go to the Tilley machine." Garrett also kept his pistol on Stewart as Garrett walked around the front of the Explorer towards the passenger's door. Thus, similar to the facts in Fulford and Diaz, sufficient evidence existed for a reasonable jury to conclude that Garrett had the conditional intent to kill or seriously harm Stewart if necessary to steal Stewart's vehicle, see Fulford, 267 F.3d at 1244, and that his taking the vehicle was not merely an afterthought, see Diaz, 248 F.3d at 1096.

Additionally, although Stewart jumped out of the Ford Explorer, left its keys in the ignition, and was inside a store when Garrett stole this vehicle, Garrett testified that, due to the violent nature of his encounter with Garrett, he, similar to the victim in Kimble, could have prevented the vehicle's taking but for his belief

15

that he had to abandon his vehicle to protect his personal safety. See Kimble, 178 F.3d at 1167-68. To the extent Garrett is contending that his threats were "hollow" because the pistol used in carrying out the carjacking later was found to be unloaded, he failed to establish that it was unloaded at the time he took the Ford Explorer. Moreover, as discussed above, a defendant's intent is to be judged objectively from "what one in the position of the victim might reasonably conclude." See Fulford, 267 F.3d at 1244. We, therefore, affirm Garrett's convictions for carjacking and possessing a firearm in relation to this carjacking.

**Issue 2:** **Whether Agent Mark Grant was a "federal agent," for purposes of 18 U.S.C. § 111**

Garrett next argues that the district court improperly denied him the opportunity to argue, and failed to instruct the jury on, the defense that Agent Grant was not a "federal agent" for purposes of § 111 because, under (1) the provision outlining the powers and duties of the U.S. Marshals Service, and (2) the terms of Agent Grant's Special Deputation Authorization, Agent Grant's arrest powers were limited to federal offenses and his duties as part of the JTTF, respectively. Garrett also contends that the court's error arose from not understanding that whether Agent Grant was acting as a federal agent was a question of fact for the jury to decide.

16

A district court's refusal to give a requested jury instruction is reviewed for abuse of discretion. Fulford, 267 F.3d at 1245. A district court abuses its discretion in refusing to give a jury instruction that the defendant has requested only when "(1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." Id.

Section 111(a)(1) proscribes assaults on persons identified in 18 U.S.C. § 1114, "while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a)(1). Such persons include "any officer or employee of the United States or of any agency in any branch of the United States Government." 18 U.S.C. § 1114.[5] Additionally, § 1114 "is to be given the 'ordinary, contemporary, common meaning.'" United States v. Schaffer, 664 F.2d 824, 825 (11th Cir. 1981) (quotation omitted).

The Supreme Court in United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), in discussing the criminal liability created in § 111, explained that it is "plain that Congress intended to protect both federal officers

---

[5] Section 1114 formerly identified a long list of federal officers and functions that fell within its scope. This list was replaced with more general language in 1996. See The Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA"), Pub.L.No. 104-132, § 727, 110 Stat. 1214, 1302.

and federal functions," and "insure a federal forum for the trial of offenses involving federal officers." Id., 420 U.S. at 679, 683-84, 95 S.Ct. at 1261, 1263. The Feola Court also concluded that, because entrusting that responsibility to a federal forum was "a matter essential to the morale of all federal law enforcement personnel and central to the efficacy of federal law enforcement activities," see id. at 684 n.18, 95 S.Ct. at 1264 n.18, it is implicit in § 111 that the "federal officer" requirement is jurisdictional, see id. at 676, 95 S.Ct. at 1260.

Furthermore, in reviewing whether the victim of a murder was an "officer or employee of the U.S. Postal Service," within the meaning of a former version of § 1114, and whether the defendant, thus, could be prosecuted for a violation of this statute, we explained that this issue was a question of law subject to de novo review. United States v. Kirkland, 12 F.3d 199, 202 (11th Cir. 1994). Additionally, we explained that, "[w]hether more than one entity can be considered the joint employer of an individual for certain functions is a legal determination dependent upon the facts and circumstances of each case." Id.[6] We also concluded that, because a contract driver for the U.S. Postal Service was not hired or

---

[6] Although Kirkland involved an assault of a U.S. postal worker, instead of an assault of a federal officer under § 111, other circuits that have addressed this issue have concluded as persuasive authority that whether a victim of a § 111 offense is a federal officer within the meaning of § 1114 is a threshold question of law for the district court to decide. See United States v. Murphy, 35 F.3d 143, 145 (4th Cir. 1994); United States v. Roy, 408 F.3d 484, 489 (8th Cir. 2005); United States v. Martin, 163 F.3d 1212, 1214 (10th Cir. 1998).

18

appointed by the Postal Service, he was not an officer or employee within the meaning of the laws governing postal employees and, thus, was not afforded protection under § 114.  See id. at 202-03.

In the instant case, Garrett, during his trial, attempted to cross-examine Agent Graves on the issue whether Agent Grant was a "federal officer" within the protections of § 111.  The district court, however, stopped this line of questioning, as well as refusing to give a jury instruction on it.  Because the issue whether Agent Grant qualified as a "federal officer" under § 1114 was a legal issue for the court to decide, the court did not abuse its discretion in refusing to give a jury question on it.  See Kirkland, 12 F.3d at 202.

Additionally, in reaching its legal determination that Agent Grant was a "federal officer" under § 1114, the court explained that it had reviewed, among other things, the powers and duties of Deputy U.S. Marshals under the relevant caselaw and 28 U.S.C. § 566(e),[7] which included "protect[ing] persons."  The record also included that Agent Grant was both a safety police officer with the Georgia Department of Motor Vehicles and a specially deputized U.S. Deputy

---

[7] Section 566(e)(1)(A) provides that the U.S. Marshals Service "is authorized to – (A) provide for the personal protection of Federal jurists, court officers, witnesses, and other threatened persons in the interests of justice where criminal intimidation impedes on the functioning of the judicial process or any other official proceedings."  See 28 U.S.C. § 566(e)(1)(A).

19

Marshal, who worked full-time in Atlanta on the FBI's JTTF, and, after being deputized, Special U.S. Deputy Marshals were authorized to (1) investigate federal crimes, (2) make arrests for the violation of federal criminal laws in Title 18 and Title 28 of the United States Code, and (3) work on the federal terrorism task force.

Although the State of Georgia continued to pay Agent Grant's salary and overtime after he joined the JTTF, the FBI reimbursed the state for these expenses, along with paying for Agent Grant's training course on "Basic Terrorism" at the FBI Academy in Quantico, Virginia. Agent Grant worked out of the FBI offices in Atlanta, used FBI equipment, drove an FBI-issued vehicle, and reported to FBI Agent Graves. Agent Graves also testified regarding the daily operations of the JTTF, explaining that "there is no distinction between [Agent Grant] and/or an [FBI] agent on my squad. They both work the same type of cases."

Furthermore, agents with the JTTF were required to follow all of the FBI's policies and procedures, including intervening in any violent state or federal misdemeanors or felonies that they witnessed. To the extent Garrett is citing to the fact that the Special Deputation Appointment, which was entered into evidence as a trial exhibit, did not specifically designate the activities at issue here, any limits Agent Grant had as a Special Deputy U.S. Marshal was relevant only in determining whether he was acting within the scope of his duties. Thus, the district

court did not abuse its discretion in rejecting Garrett's proposed jury instruction on the question whether Agent Grant was a "federal agent," for purposes of 18 U.S.C. § 111, based on the court's determination that it was a legal issue for the court to decide, and it did not err in deciding this question in the affirmative. Cf. Schaffer, 664 F.2d at 825 (holding that former version of § 1114, which designated "any person assisting (any officer or employee of the Department of Justice)[,]" was not limited to persons directly employed by the United States, and that the district court, therefore, did not err in instructing the jury that a person employed to assist the U.S. Marshal was an employee referred to in § 1114).

**Issue 3:** **Whether Agent Grant was acting within the scope of his duties when he intervened in Garrett's armed robbery of Regina Person**

Garrett further argues that the government produced insufficient evidence for a reasonable jury to conclude that Agent Grant was acting within the scope of his duties as a Special Deputy U.S. Marshal when he intervened in Garrett's armed robbery of Person. Garrett contends that Agent Grant was a state law enforcement officer, with limited authority as a special U.S. Deputy Marshal, who was heading home from his state office when he intervened in a state crime unrelated to terrorism. Garrett asserts that, in concluding that any federal officer who intervenes in a state offense does so in his official capacity as a federal officer, the court failed to consider the specific facts of this case. Garrett also contends that

21

testimony relating to a policy requiring FBI agents to intervene in state crimes committed in their presence was inapplicable to Agent Grant because he was not an FBI agent.

As discussed above, § 111(a)(1) proscribes assaults on any person identified in 18 U.S.C. § 1114, "while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a). We, however, have explained that "[t]here is no bright-line test to define 'performance of official duties' under the statute." United States v. Clemons, 32 F.3d 1504, 1507 (11th Cir. 1994). Instead, "whether a federal officer is engaged in the performance of his or her official duties turns on whether the federal officer is acting within the scope of what he or she is employed to do, or is engaged in a purely personal frolic." Id. (citation omitted). Because this jury question "speaks to the court's jurisdiction in this matter," our review is plenary. Id.

In United States v. Stephenson, 708 F.2d 580 (11th Cir. 1983), an FBI agent was assaulted and robbed of her purse as she walked from her car towards the FBI building. See id. at 581. The agent's purse contained her service revolver, an FBI badge, and identification. See id. Reasoning that the agent was "on her way to report for work at the FBI office," and that she was "properly attempting to prevent theft of federal property" when she was struggling with her assailant, we concluded

22

that the evidence was sufficient for a trier of fact to find that the agent was engaged in the performance of her official duties. See id.

Similarly, in Clemons, we concluded that the jury reasonably concluded that the conduct of a Special Agent with the Federal Drug Enforcement Administration ("DEA") fell within the range of his prescribed, official duties when he was murdered. See id. at 1507-08. We explained that, although the agent was stopped at a gas station making a call to his girlfriend at the moment he was murdered, at approximately 10 p.m., while his partner was inside the station asking for a number for pizza delivery, they were on their way to a meeting concerning an investigation being conducted jointly by the DEA and the local police department. See id. at 1506, 1508. We also discussed that the victim's partner testified that, when he and the victim worked together, their schedules often were erratic, leading them to work late at night. See id. at 1508. We, therefore, concluded that it was not unreasonable for the jury to infer that the agents might have, on occasion, arranged during working hours for some form of food, and that the victim was engaged in his duties as a DEA agent. See id.

In United States v. Hoy, 137 F.3d 726 (2d Cir. 1998), a case both parties cite to as persuasive authority, the Second Circuit examined whether a deputy U.S. Marshal who was deployed from Tucson, Arizona to New York City, to provide

23

security during the World Trade Center bombing trial, and who was punched when he intervened in a purse-snatching attempt, was "engaged in" his official duties under § 111. See id. at 728. Although the defendant argued that the officer was an off-duty federal officer in another venue who was walking home at the time he intervened, the Second Circuit explained that "[t]he scope of what the agent is employed to do is not defined by whether the officer is abiding by laws and regulations in effect at the time of the incident, nor is the touchstone whether the officer is performing a function covered by his job description." See id. at 731. The Second Circuit also discussed that "[i]t seems clear from the governing policy that a deputy marshal is expected and authorized to intervene in certain limited circumstances, especially where there is harm or a threat of harm as a consequence of the violation of state law." See id. Thus, the Second Circuit concluded that the jury had sufficient reason to believe that the deputy U.S. Marshal was acting in the performance of his official duties when he intervened in a confrontation between the defendant and his wife. See id.

Here, Agent Grant testified that he was driving home in his unmarked FBI-issued vehicle when he saw Garrett sideswipe Person's vehicle, approach her with a silver pistol, and begin to rob her. Agent Grant then approached Garrett with his blue lights flashing and his firearm drawn, identified himself as both a state and

24

federal law-enforcement agent, and ordered him to drop his firearm.[8]  Garrett,

however, kept his pistol pointed at Agent Grant.  Moreover, while Agent Grant was

identifying himself to Agent Colton, Garrett jumped back into Stewart's Ford

Explorer and drove away.  Thus, under the FBI's policies, which both Agents

Grant and Graves testified included intervening in violent state or federal

misdemeanors or felonies, that agents, including Special Deputy U.S. Marshals,

witnessed, Garrett was required to intervene.  The evidence, therefore, was

sufficient for a reasonable jury to conclude that Agent Grant was acting within the

scope of his duties when he intervened in Garrett's armed robbery of Person.

**Issue 4:**	**Whether the district court committed reversible error, in violation of the Supreme Court's decision in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, when it sentenced Garrett to 512 months' imprisonment**

Garrett last argues that the court violated the Supreme Court's decision in

Booker when it decided that it was "not authorized" to impose a lower sentence

based on the court's personal belief that the offenses should have been charged in

state court.  Garrett contends that, although the court still is required to consider his

guideline range, this range is no longer mandatory, and the court also was required,

---

[8]  We note that, even if Agent Grant had not identified himself, we determined that a former similar version of § 111 did not require a showing that the defendant violated the act with the knowledge that his victim was a federal officer.  See United States v. Irick, 497 F.2d 1369, 1373 (5th Cir. 1974).

25

pursuant to U.S.S.G. § 3553(a)(4) and (7), to consider the need to avoid unwarranted sentencing disparities and to provide restitution. Garrett concludes that the court's sentence was unreasonable and should be vacated.

The Supreme Court, prior to Garrett's sentencing hearing, issued its decision in Booker, holding that the mandatory nature of the federal guidelines rendered them incompatible with the Sixth Amendment's guarantee to the right to a jury trial. Booker, 543 U.S. at 232-35, 125 S.Ct. at 749-51.[9] In a second and separate majority opinion, the Booker Court explained that, to best preserve Congress's intent in enacting the Sentencing Reform Act of 1984, the appropriate remedy was to "excise" two specific sections—18 U.S.C. § 3553(b)(1) (requiring a sentence within the guideline range, absent a departure) and 18 U.S.C. § 3742(e) (establishing standards of review on appeal, including de novo review of departures from the applicable guideline range)—thereby effectively rendering the Sentencing Guidelines advisory only. Id. at 258, 125 S.Ct. at 764. Thus, the Booker Court concluded that a defendant's guideline range is now advisory; it no longer dictates the final sentencing result but, instead, is an important sentencing

---

[9] The Supreme Court in Booker explicitly reaffirmed its rationale in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." See Booker, 543 U.S. at 244, 125 S.Ct. at 756.

factor that the sentencing court is to consider, along with the factors contained in 18 U.S.C. § 3553(a).[10]  Id. at 259-60, 125 S.Ct. at 764-65.  Moreover, the Booker Court concluded that courts of appeals now must review sentences for unreasonableness.  Id. at 264, 125 S.Ct. at 767.

In applying Booker, we have determined that a district court's interpretation of the federal guidelines still is subject to de novo review, while its factual findings must be accepted unless clearly erroneous.  United States v. Jordi, 418 F.3d 1212, 1214 (11th Cir.), cert. denied, 126 S.Ct. 812 (2005).  Although the federal guidelines now are only advisory, courts "remain[] obliged to 'consult' and 'take into account' the [g]uidelines in sentencing," and the guidelines "remain an essential consideration in the imposition of federal sentences, albeit along with the factors in § 3553(a)."  United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005).  However, after a district court has calculated a defendant's guideline range,

_____

[10]  The relevant sentencing factors enumerated in § 3553(a) include: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed–(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for . . . (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .; (5) any pertinent policy statement []; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense."  See 18 U.S.C. § 3553(a)(1)-(7).

it "may impose a more severe or more lenient sentence," which we review only for reasonableness. Id. at 1179. Moreover, we do not apply the reasonableness standard to each individual decision made during the sentencing process; instead, we review the final sentence for reasonableness. Id. at 1178.

As a preliminary matter, to the extent Garrett's arguments on appeal can be construed as contending that sentencing error occurred because the court denied his motion to depart from his criminal history category under § 4A1.3, based on the fact that his prior convictions were for juvenile offenses, we have determined that a challenge to a decision not to depart downward is a challenge to the court's preliminary application of the guidelines. United States v. Winingear, 422 F.3d 1241, 1245 (11th Cir. 2005) (addressing a district court's refusal to depart under U.S.S.G. § 5K2.23). We, however, also determined in Winingear that Booker did not alter our precedent that we lack jurisdiction to review a court's discretionary decision not to depart downward from a defendant's guideline range. Id.

Thus, we lack jurisdiction to review the district court's decision not to depart from Garrett's criminal history category. Moreover, the district court was required to apply Garrett's mandatory minimum consecutive statutory sentences of 120 months' and 300 months' imprisonment for his two § 924(c) offenses in Counts 2 and 4. See United States v. Shelton, 400 F.3d 1325, 1333 n.10 (11th Cir. 2005)

28

(explaining that courts still must impose statutory mandatory minimum sentences, despite Booker's remedial holding that the federal guidelines are merely advisory). The only issue for our review, therefore, is whether the district court's sentence of 92 months' imprisonment for Counts 1 and 3 was reasonable.

In explaining that it had the discretion post-Booker to impose a sentence outside of Garrett's advisory guideline range based on unique factors in the case, the court demonstrated that it had considered "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See 18 U.S.C. § 3553(a)(6). Moreover, in discussing that Garrett should not be required to pay a fine and could postpone paying the special assessment fees until after completing his term of imprisonment, the court showed that it had considered the kinds of sentences available. See 18 U.S.C. § 3553(a)(3).

Additionally, in explaining that it had considered the contents of Garrett's PSI, the court, at least implicitly, demonstrated that it had considered, along with Garrett's guideline range, the other sentencing factors in § 3553(a). Indeed, applying these other factors, Garrett's PSI reflects that, although he only was age 20 when he committed the instant offense, he had a lengthy juvenile criminal history and he had not taken advantage of past opportunities to rehabilitate himself.

29

See 18 U.S.C. § 3553(a)(1) ("the history and characteristics of the defendant"); 18 U.S.C. § 3553(a)(2)(D) ("the need for the sentence imposed to provide the defendant with needed [treatment]"). Thus, Garrett has failed to show that the court did not consider § 3553(a)'s sentencing factors, or that his 92-month sentence for Counts 1 and 3, which was at the bottom end of his guideline range of 92 to 115 months' imprisonment, was unreasonable.

Finally, to the extent Garrett is arguing that the court misapprehended its authority under Booker to impose a sentence outside of his advisory guideline range, notwithstanding any authority under the guidelines to grant a departure, he failed to raise this claim in the district court. Indeed, when the court asked Garrett whether he had any objections to the court's pronouncement of sentence, Garrett clarified that his only objections were to (1) the over-representation of his criminal history, and (2) that his sentence was excessive in comparison to what he would have received if he had been charged in state court. Thus, our review of whether the district court misunderstood the extent of its authority under Booker to sentence Garrett outside of his guideline range only is for plain error. See United States v. Rodriguez, 398 F.3d 1291, 1297-98 (11th Cir.) (reviewing a newly raised Booker challenge for plain error), cert. denied, 125 S.Ct. 2935 (2005).

In the instant case, however, the district court did not err, plainly or otherwise, in declining to impose a sentence outside of Garrett's guideline range for Counts 1 and 3 of his indictment. The court explicitly discussed at sentencing its discretion and power post-Booker to impose a sentence outside of Garrett's advisory guideline range or to otherwise depart based on unique factors in the case. The court, therefore, understood its authority to depart from Garrett's guideline range, but chose not to do so. See Crawford, 407 F.3d at 1178-79.

Accordingly, we conclude that the district court did not err in denying Garrett's Rule 29 motions for judgments of acquittal as to his carjacking and assault charges. The district court also did not either abuse its discretion in denying Garrett's proposed jury question on the legal question whether Agent Grant was a "federal agent" for purposes of § 111, or err in deciding this question in the affirmative. Furthermore, we conclude that the district court did not err, plainly or otherwise, in sentencing Garrett to 512 months' imprisonment. We, therefore, affirm Garrett's convictions and sentences.

**AFFIRMED.**